IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PATRICIA CLARK, et al.,     :
           Plaintiffs,     :
                   :       No. 4:00-CV-1306
       v.             :
                   :       (Judge McClure)
ESTELLE B. RICHMAN, in her     :
official capacity as Secretary of     :
Public Welfare of the     :
Commonwealth of Pennsylvania,     :
           Defendant.     :

# M E M O R A N D U M

August 17, 2005

## TABLE OF CONTENTS

Background ................................................................................... 2

Discussion ................................................................................... 5

    Part I: Findings of Fact ........................................................ 5

        A. Background of Pennsylvania's Participation
           in the Federal Medicaid Program .......................................... 5

        B. The Parties ............................................................ 8

        C. Overview of Pennsylvania's
           Medical Assistance Program ................................................ 10

           1. DPW's Monitoring of MCOs
               For Compliance   ................................................ 16

           2. The Fee-For-Service System, AHS,
               and the ACCESS Plus Program ................................. 19

        D. DPW's Dental Summits ....................................... 24

        E. DPW's Future Plans for the

Medical Assistance Dental Program ..................................... 29

F. Individual Plaintiffs' Experiences
With Obtaining Dental Services ........................................... 31

G. Comparative Availability of Dental Services ..................... 37

1. Statistical Distribution of Dentists ............................ 37

2. Utilization ................................................................. 39

3. Reimbursement Rates ................................................ 43

H. Early and Periodic Screening, Diagnostic,
and Treatment (EPSDT) Services ......................................... 57

Part II: Conclusions of Law ................................................. 57

A. Plaintiff's Equal Access Challenge ..................................... 57

1. The Level of Reimbursement Rates ........................... 62

2. The Level of Dentist Participation ............................ 69

3. Reports of Difficulty Obtaining Services ................. 72

4. The Level of Utilization of Dental Services  ............ 76

5. Whether DPW Admits Rates Are Inadequate ........... 78

6. Final Balancing of the Factors .................................. 80

B.      Plaintiffs' EPSDT Challenge ................................... 82

Conclusion ..................................................................................... 86

## BACKGROUND:

This action is brought on behalf of a class of disabled individuals who receive Medical Assistance (MA) benefits.  Plaintiffs, by and through their next friends, allege that they have been denied access to dental services due to the policies of defendant, the Secretary of the Pennsylvania Department of Public Welfare (DPW), and seek enforcement of certain provisions of Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v (Title XIX, or the Medicaid Act).

Specifically, plaintiffs allege that DPW violated 42 U.S.C. § 1396a(a)(10)(A)

by not providing them with medically necessary dental services (Count I).  They allege that DPW violated 42 U.S.C. § 1396a(a)(8) and 42 C.F.R. § 435.930(a) by failing to provide dental services to plaintiffs and classmembers with reasonable promptness (Count II).  Plaintiffs allege a claim based on comparability of services as well (Count III).

Plaintiffs also allege that DPW violated 42 U.S.C. § 1396a(a)(30)(A) by failing to take necessary steps, such as setting adequate reimbursement rates, to ensure equal access to dental services for MA recipients (Count IV).  Finally, plaintiffs allege that DPW violated 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(43), 1396d(a)(4)(B), and 1396d(r) by not ensuring that children under the age of 21 timely receive early and periodic screening, diagnostic, and treatment (EPSDT) services in the form of dental care (Count V).

Following extensive discovery, plaintiffs filed a motion for partial summary judgment on issues of liability.  Shortly thereafter, DPW cross-filed a motion for summary judgment.  Plaintiffs then filed a motion to strike portions of defense expert Catherine Sreckovich's report.

On October 7, 2004, the court ruled that although Title XIX provides private rights vindicable through § 1983, the only sections under which plaintiffs could proceed were the "equal access" provision, 42 U.S.C. § 1396a(a)(30)(A) (Count

IV), and certain EPSDT services provisions, 42 U.S.C. §§ 1396a(a)(43), 1396d(a)(4)(B), 1396d(r)(3) (Count V).  See generally Clark v. Richman, 339 F. Supp. 2d 631, 637-47 (M.D. Pa. 2004).  The court also denied plaintiffs' motion to strike portions of Sreckovich's report and ruled that it would take plaintiffs' objections to her report under advisement during trial.  See Clark, 339 F. Supp. 2d at 647-49.

The court scheduled a non-jury trial to hear the parties on the remaining issues, which the court framed as follows:

1.    Plaintiffs' Count IV based on the equal access provision, § 1396a(a)(30)(A), particularly:
   A.    whether plaintiffs have adduced sufficient evidence to compare the dental care and services available to plaintiffs to that available to the general population (i.e., insured individuals) in the pertinent geographic areas; and if so,
   B.    whether the Commonwealth's reimbursement rates fail to ensure that plaintiffs and classmembers in the pertinent geographic areas have at least the same access to dental care and services as the rest of the general population in those areas.
2.    Plaintiffs' Count V, based on the EPSDT services provisions, particularly, whether the Commonwealth has failed to employ processes to assure the timely provision of those services required to be provided.

Clark, 339 F. Supp. 2d at 649.  After granting the parties' joint motion for a continuance, the court held an eight-day non-jury trial in March of 2005.  Following trial, the court afforded the parties additional time to submit supplemental proposed

findings of fact and conclusions of law, and to submit post-trial briefs.  The matter

is now ripe for decision.  For the following reasons, the court finds that plaintiffs

have not carried their burden of showing that DPW is in violation of the equal

access provision or the pertinent EPSDT provisions.


## DISCUSSION:

We present our findings of fact and conclusions of law below.  Given that

some issues are mixed questions of law and fact, we proceed with the

understanding that any finding or conclusion better characterized as the other

should be considered incorporated into the appropriate section.

### I. Findings of Fact

## A. Background of Pennsylvania's Participation in the Federal Medicaid Program

1.      Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v, (Title

XIX, or the Medicaid Act), established the Medicaid program in 1965 as a

cooperative federal-state program through which various health care services,

including certain dental services, are provided to indigent, elderly and disabled

individuals.  "If a state chooses to participate in the program, it must comply with

the Medicaid Act and implementing regulations."  Pa. Pharm. Ass'n v. Houstoun,

283 F.3d 531, 533 (3d Cir. 2002) (en banc) (citing <u>Wilder v. Virginia Hosp. Ass'n</u>, 496 U.S. 498, 502 (1990)).

2.      States may pay for certain enumerated services and may pay for additional services.  <u>See</u> 42 U.S.C. § 1396a(a)(10)(A); 42 C.F.R. §§ 440.210, 440.220, 440.225.

3.      Each year, the federal government allocates funds to participating states "for the purpose of enabling each State, as far as practicable under the conditions in such State," to furnish Medical Assistance to eligible individuals.  42 U.S.C. § 1396.  Under Title XIX, a participating state must designate a "single State agency to administer or supervise the administration of the [state Medicaid] plan." 42 U.S.C. § 1396a(a)(5).

4.      Pennsylvania participates in Title XIX. The Department of Public Welfare (DPW, or the Department) is the designated single state agency and must prepare a medical assistance plan consistent with federal law and submit it to the Centers for Medicare and Medicaid Services (CMS) of the United States Department of Health and Human Services (HHS) for approval.  42 C.F.R. § 430.10.  The Commonwealth's plan is known as the Medical Assistance (MA) program.

5.      Dental services for children under the age of 21 are mandatory services while non-emergency dental services for adults are optional services that the Commonwealth has elected to offer under its plan.  See 42 U.S.C. § 1396a(a)(10); 42 U.S.C. § 1396d(a)(4)(B); 42 U.S.C. § 1396d(r)(3)(B); see also Tr. Mar. 24, 2005, at 16.[1]  Pennsylvania is one of only thirteen states that provides comprehensive coverage for adults.  See Tr. Mar. 15, 2005, at 102; Ex. D-51.[2]

6.      Upon approval of its plan by CMS, a state becomes eligible for federal matching funds for reimbursement of the cost of specific types of medical care and services so designated in the plan.  42 U.S.C. § 1396a(a).  CMS has approved the Department's state plan and the Department has never been cited for noncompliance or denied federal funds for noncompliance by CMS.  See Tr. Mar. 15, 2005, at 171-72.

7.      There are currently more than 1.7 million individuals enrolled to receive MA benefits in Pennsylvania under the Commonwealth's MA program. Classmembers comprise only 15% of the total MA population or approximately 270,000 individuals.  Of the total MA population, 70% receive services through the

---

[1] Trial transcripts are docketed at record document numbers 128-35.  For clarity, we will only note record document numbers in the margins the first time we cite a document.

[2] The parties' exhibit lists are docketed at record document numbers 125-26.

HealthChoices program while the other 30% receive services through the fee-for-service or ACCESS Plus program.  Tr. Mar. 15, 2005, at 132.  These programs are discussed more fully below, <u>see</u> <u>infra</u> Part I.C.

**B. The Parties**

8.      Plaintiff Patricia Clark is an adult with Down syndrome and mental retardation.  Factual Stips., at ¶1.[3]

9.      Patricia is eligible for MA because she has SSI-level disabilities.  Factual Stips., at ¶ 2.

10.     Patricia is enrolled in the Best Healthcare of Western Pennsylvania plan, one of the HealthChoices options in western Pennsylvania.  Factual Stips., at ¶3.

11.     Plaintiff Sarah Carrasquillo is an adult with autism, mental retardation, and a cleft palate.  Factual Stips., at ¶4.

12.     Sarah is eligible for MA because she has SSI-level disabilities.  Factual Stips., at ¶5.

13.     Sarah resides in Lancaster County and receives her benefits through the fee-for-service system.  Factual Stips., at ¶5.

---

[3] The parties' factual stipulations are attached to Defendant's Pretrial Memorandum, record document number 107, as Exhibit 1.

14.     Plaintiff K.S. is a child with Down syndrome and mental retardation.

Factual Stips., at ¶6.

15.     K.S. is eligible for MA because she has SSI-level disabilities.  Factual

Stips., at ¶7.

16.     K.S. receives her MA benefits through the fee-for-service system.

Factual Stips., at ¶8.

17.     The court certified the following class on November 1, 2002,

consisting of two subclasses:

> Class A: All recipients of Medical Assistance benefits under age 21 who
> are eligible because they have disabilities that meet the disability criteria
> under the Supplemental Security Income (SSI) program.

> Class B: All categorically needy adult recipients of Medical Assistance
> benefits who are eligible because they have disabilities that meet the
> disability criteria under the Supplemental Security Income (SSI) program.

Factual Stips., at ¶9.

18.     Defendant Estelle Richman is the Secretary for Public Welfare and is

responsible for administering the programs under the jurisdiction of DPW.  Factual

Stips., at ¶11.

19.     DPW is the single state agency designated by Pennsylvania to take

responsibility for the State Medical Assistance Plan (the MA program) as required

by 42 U.S.C. § 1396a(a)(5) and 42 C.F.R. § 431.10, see supra ¶¶4-6.  Factual

Stips., at ¶12.


## C. Overview of Pennsylvania's Medical Assistance Program

20.    The Medical Assistance program (MA program) was initially

established as a fee-for-service program, which permitted MA recipients to seek

services directly from any provider enrolled in DPW's MA program who agrees to

serve them.  Factual Stips., at ¶13.

21.    In 1997 Pennsylvania was granted a waiver, known as

"HealthChoices," by the federal Centers for Medicare and Medicaid Services

(CMS) in order to mandate that MA recipients receive services through Managed

Care Organizations (MCOs, referred to by DPW as managed care plans), instead

of the fee-for-service system.  Factual Stips., at ¶14.

22.    Under the HealthChoices program, MA recipients receive dental

services by means of enrollment into MCOs operating in the following three regions

which encompass a total of 25 counties:

Healthchoices Southeast Zone--Bucks, Chester, Delaware, Montgomery and

Philadelphia counties.

HealthChoices Southwest Zone--Allegheny, Armstrong, Beaver, Butler,

Fayette, Green, Indiana, Lawrence, Washington and Westmoreland counties.

<u>Lehigh/Capital Zone</u>--Adams, Berks, Cumberland, Dauphin, Lancaster,

Lebanon, Lehigh, Northampton, Perry and York counties.

Factual Stips., at ¶¶15, 23.

23.     Eligible MA recipients in the remaining 42 counties still receive their

dental services through the fee-for-service system.  Factual Stips., at ¶15.  The fee-

for-service system is discussed in further detail below, <u>see</u> <u>infra</u> Part I.C.2.

24.     The HealthChoices Standard Agreement, which is the template for all

contracts between DPW and the various MCOs, includes a term that individual MA

recipients, including classmembers, are to be provided a choice of two dentists

within an MCO's dental provider network.  Factual Stips., at ¶17; Tr. Mar. 16,

2005, at 18; Tr. Mar. 21, 2005, at 135-36; Ex. D-53, at 97.

25.     The HealthChoices Standard Agreement includes a term that if an

MCO cannot find someone to perform a covered dental procedure or service

within an MCO's provider network, the MCO is obligated to negotiate and provide

the service through a non-participating provider.  Factual Stips., at ¶18; <u>see</u> Tr.

Mar. 16, 2005, at 19; Ex. D-53, at 94.

26.     The HealthChoices Standard Agreement also requires an MCO to

establish a "special needs unit" to assure that persons with special needs and any

individual who has difficulty obtaining access to medically necessary services,

including dental services, could obtain such services.  Tr. Mar. 16, 2005, at 24-25; Tr. Mar. 22, 2005, at 20-21; Ex. D-53, at Sub-Ex. NN.

27.     The HealthChoices Standard Agreement broadly defines the category of MA recipients for whom the special needs units were established, including classmembers, and will provide assistance for a host of issues such as locating a provider or arranging for transportation.  Tr. Mar. 22, 2005, at 15; Ex. D-52, at Sub-Ex. NN.  As one special needs unit coordinator stated, "anybody who contacts our unit is considered a person of special needs. We pretty much help anyone who contacts us." Tr. Mar. 23, 2005, at 6.

28.     Depending on the particular dental need expressed by an individual who contacts the special needs unit, qualified case managers generally gather the necessary information to determine whether a specific type of dentist is required, i.e., pediatric, whether anesthesia is needed in order to provide the treatment and provider location preference.  Tr. Mar. 22, 2005, at 13-14; Tr. Mar. 23, 2005, at 8, 16.

29.     Based on the information obtained, the case managers will then provide the individual with dentists available to provide the necessary service or schedule a three-way call with an available dental provider to make the appointment for the individual.  Tr. Mar. 22, 2005, at 33; Tr. Mar. 23, 2005, at 9, 17.

30.     All the special needs unit coordinators who testified, and who represent all three HealthChoices zones, never had an occasion where they could not secure a dental appointment for an MA recipient who contacted the unit.  Tr. Mar. 22, 2005, at 34; Tr. Mar. 23, 2005, at 9, 17.

31.     The special needs units not only secure dental appointments for MA recipients, but they also engage in the arrangement of transportation services for individuals requesting and requiring such services to maintain a dental appointment. Tr. Mar. 22, 2005, at 34; Tr. Mar. 23, 2005, at 9, 17.

32.     Under the HealthChoices Standard Agreement, the MCOs must coordinate services through the Medical Assistance Transportation Program (MATP), a federal-state funded program through county grants, which provides payment for transportation services for MA recipients to medical appointments, including dental visits.  Tr. Mar. 16, 2005, at 20-22; Ex. D-53, at Ex. L.

33.     The MATP exists for the sole purpose of ensuring that MA recipients, including classmembers, have actual access to necessary medical services by being able to get to and from a medical appointment through appropriate transportation modes.  See 42 C.F.R. § 431.53.

34.     Above and beyond the HealthChoices contractual requirements, one MCO, Keystone Mercy Health Plan, not only coordinates transportation through

-13-

the MATP, but also has its own transportation service for individuals not enrolled in the MATP that "truly needed the services in emergent care, then we would facilitate transportation for the member to the appointment." Tr. Mar. 22, 2005, at 34.

35.     In order to advise MA recipients, including classmembers, of the availability of assistance from the special needs units, the MCOs distribute outreach materials, new member "kits," quarterly newsletters, direct member mailings, brochures and even refrigerator magnets. Tr. Mar. 22, 2005, at 17, 30-31; Tr. Mar. 23, 2005, at 7, 15; Exs. D-10 through D-18. The information distributed includes contact numbers for the special needs units along with information on the importance of oral health and how recipients can obtain dental services. Tr. Mar. 21, 2005, at 147-49; Exs. D-14 through D-18.

36.     In addition to the frequent mailings and outreach materials provided by the MCOs, the HealthChoices Standard Agreement requires the development and distribution of handbooks to MA recipients. Tr. Mar. 16, 2005, at 21; Tr. Mar. 21, 2005, at 145-46; Ex. D-53, at Sub-Ex. DD.

37.     The handbook is required to be mailed to an MA recipient within five days from the individual's enrollment in the managed care plan. See Ex. D-53, at Sub-Ex. DD. Versions of the handbooks also appear on the MCOs' websites. Tr.

Mar. 21, 2005, at 146; see e.g., Ex. D-12.

38.     The handbooks, as reviewed and approved by DPW, must contain

information regarding access to services, contact numbers for the special needs

and member services units, benefit coverage, complaint, grievance and fair hearing

rights.  Tr. Mar. 16, 2005, at 21; Tr. Mar. 21, 2005, at 141-42; Ex. D-53, at Sub-Ex.

DD.

39.     Moreover, the handbooks contain specific information on the

provision of dental services, including dental benefit coverage, the ability to self-

refer for dental services, and necessary contact information for individuals

encountering a problem in locating a dentist.  Tr. Mar. 21, 2005, at 142-43; see Exs.

D-10, at 15-16, D-11, at 8.

40.     Handbooks must also describe the special needs unit and the

availability of transportation assistance.  Tr. Mar. 21, 2005, at 143-44; Tr. Mar. 22,

2005, at 16; see Exs. D-10, at 14, 21, D-11, at 6.

41.     The Department contracts with an actuarial firm to develop the

managed care rates under the CMS guidelines, which include the analysis of

financial data to arrive at average costs, frequency of services, utilization trends,

commercial market rates, and Medicaid trends for the various medical services

provided.  Tr. Mar. 16, 2005, at 31-32.

-15-

42.     The actuarial firm recommends payment rates to the Department for the MCOs in the HealthChoices program based on the consideration of the CMS guidelines and such rates that are accepted by the Department are then forwarded to CMS for approval.  Tr. Mar. 16, 2005, at 31-32.

43.     In the rate development for 2002, the Department directed the actuaries to trend the rates regarding the provision of dental service at a high rate in order to support dental utilization increases for the HealthChoices program since the Department was encouraging and promoting member education and member outreach by the managed care plans.  Tr. Mar. 16, 2005, at 47.

44.     The Department's payment rates to the MCO's operating under the HealthChoices program for the past two (2) to three (3) years include a range of $8 to $10 per member per month for dental services.  Tr. Mar. 22, 2005, at 97-98.

45.     CMS approved the rates paid to the MCOs operating under the HealthChoices program.  Tr. Mar. 16, 2005, at 35.

**1. DPW's Monitoring of MCOs For Compliance**

46.     The Department's Bureau of Managed Care Operations (BMCO) is responsible for monitoring managed care plans' compliance with the above cited HealthChoices Standard Agreement requirements. The BMCO fulfills this responsibility through on-sight reviews, inspection of managed care plan

documents, review of required contract reports and complaint and grievance report
reviews.  Tr. Mar. 16, 2005, at 27-28; Tr. Mar. 21, 2005, at 132, 136.

47.      From the inception of the HealthChoices program in 1997, the
provision of dental services was a focus for monitoring efforts by the BMCO.  Tr.
Mar. 16, 2005, at 28.

48.      In 2001, the Department undertook a specific monitoring effort under
the direction of the Department's Office of the Medical Director. The purpose of
this monitoring effort was to increase utilization of dental services by MA recipients
since the primary goal of the HealthChoices program is to improve access to
services and quality of care.  Tr. Mar. 16, 2005, at 47.

49. The BMCO assisted with the collection of data and conducted test calls
to the managed care special needs unit as part of the special dental monitoring
effort.  Tr. Mar. 16, 2005, at 30.  Concerns were identified through this monitoring
effort, such as, incomplete and incorrect dental network information being
maintained and the need to improve access to dental services for special
needs members.  See Exs. P-25 through P-29.

50.      In response, each managed care plan submitted and implemented
"plans of correction" in 2002 and 2003.  Tr. Mar. 21, 2005, at 139-40.

51.      The monitoring reports do not indicate whether correction plans have

improved access, at least as of the close of 2002.  See Exs. P-25 through P-29.

52.    Still, general monitoring of MCOs occurs on an ongoing basis with respect to compliance with the HealthChoices Standard Agreement requirements. BMCO's "core team" approach provides for the assignment of one staff person as the core team manager for each of the managed care plans along with support staff from other Department offices, i.e., financial, special needs division, medical director.  The core teams visit the MCOs, review documents, monitor member service hotlines, review appeals and grievances and handle any complaints.  Tr. Mar. 16, 2005, at 26-27.

53.    Additionally, the BMCO established its own special needs division to oversee and monitor the managed care special needs units and also to assist individuals in both fee-for-service and managed care to obtain services, including dental services.  Tr. Mar. 16, 2005, at 24-26; Tr. Mar. 22, 2005, at 14-15; Ex. D-53, at Sub-Ex. NN.

54.    The Department's special needs division and its role in the HealthChoices program and the responsibilities of the MCOs' special needs units were made known to advisory committees and advocacy groups, including the MAAC, the Pennsylvania Health Law Project, Juvenile Law Project, AIDS Law Project and the Special Needs Law Project.  Tr. Mar. 22, 2005, at 16.

55.     The BMCO and its special needs division receive very few complaints regarding dental services or the need for assistance in locating a dentist. In fact, of all the inquiries made to the BMCO's special needs division between 2002 and 2004, only 3-4% of the calls related to dental issues. Of the 3-4%, assistance in locating a dentist was only one of various inquiries made. The inquiries included billing questions, eligibility issues and benefit package coverage as well.  Tr. Mar. 22, 2005, at 22-26.

56.     On the few occasions when assistance has been requested to locate a dentist or make a dental appointment, the special needs division has always been able to assist the MA recipient.  Tr. Mar. 22, 2005, at 22-27.

57.     Despite the special needs units' apparent success rate in assisting callers, DPW's monitoring reports still show low utilization of dental services, at least during 1999 through 2002.  Exs. P-25 through P-29.

**2. The Fee-For-Service System, AHS, and the ACCESS Plus Program**

58.     Up until March 1, 2005, the Department directly operated the fee-for-service delivery system in the 42 counties not served by the HealthChoices program.  Factual Stips., at ¶22.  The fee-for-service system has since been replaced with the ACCESS Plus program, discussed more fully below, see infra ¶70.

59.     In the fee-for-service system, the Department enters into agreements with providers of health care services, including dentists, and pays the providers directly for services rendered to MA recipients.  Tr. Mar. 15, 2005, at 178.

60.     In order to operate the fee-for-service delivery system and also to comply with federal requirements regarding services to children under the early and periodic screening, diagnostic, and treatment (EPSDT) program, the Department contracted with AHS to provide assistance to families seeking health services, including dental services.  Factual Stips, at ¶32; Ex. P-48, at 19-21.

61.     This program was commonly referred to as the Family Care Network. Under the Family Care Network program, AHS developed and maintained a provider network, conducted outreach and provided education to MA recipients regarding available health care services, assisted recipients in scheduling appointments and conducted follow up with recipients for medical conditions detected during the initial EPSDT screenings. Ex. P-48, at 25.

62.     AHS's outreach activities included annual mailings of letters, flyers, pamphlets and brochures regarding available assistance through the Family Care Network and also included outreach calls to MA recipients. Ex. P-48, at 20.

63.     During the time that the Family Care Network was in operation, AHS received calls for assistance with scheduling dental appointments for children.

When asked to schedule a dental appointment for a child, AHS would gather necessary information regarding special needs of the child and any travel restrictions. AHS would then contact providers to determine their availability to provide the service requested.  Ex. P-48, at 28-29; <u>see</u> Factual Stips., at ¶33.

64.     AHS provided DPW with reports every six months showing the gain and loss of providers by county, and showing the number of providers available by county.  Factual Stips., ¶34.

65.     Based on reports required to be submitted to the Department, AHS was able to provide assistance to more than 98% of all MA recipients who contacted AHS for assistance in accessing dental services.  Ex. D-55, at 15.

66.     These data are slightly deceiving.  For one, an "assist" does not mean that an MA recipient ultimately received requested dental services.  An "assist" includes interactions whereby a caller was given a list of dental providers.  Whether or not a caller obtained dental services from a listed provider is not recorded unless the caller calls back.  Ex. 48, at 61-62.  Callers may often give up and not call back after failing to make an appointment with a listed dentist.  <u>See, e.g.</u>, Tr. Mar. 15, 2005, at 84-85.

67.     Further, not all calls were necessarily routed to the special needs unit. <u>See</u> Exs. P-25, at 14, P-26, at 21, P-27, at 14.

68.     AHS also admits that it is difficult to find dentists, especially

specialists, willing and able to treat MA children.  See Ex. P-17, at 1; see also Ex.

P-9, at 2.

69.     With respect to the fee-for-service adult MA recipient population, the

Department published a handbook which was distributed to all fee-for-service MA

recipients and also made available on the Department's Office of MA website. The

fee-for-service handbook provides detailed information on covered services,

including dental benefits, information on how to find a dentist and information on

how a recipient can navigate the system and receive services.  Tr. Mar. 15, 2005, at

133-34; Ex. D-4.

70.     In 2004, the Department sought a vendor to operate a primary care

case management system in combination with a disease management program.  Tr.

Mar. 24, 2005, at 8. The new program, effective March 1, 2005, called ACCESS

Plus, enables MA recipients in the 42 counties in which the fee-for-service

previously operated to choose their own primary care providers, receive active care

coordination and case management services and, if eligible, disease management

services. See Ex. D-1, at 2.

71.     The ACCESS Plus program also replaces the Family Care Network

which focused solely on services to children. ACCESS Plus expands the services

previously provided by the Family Care Network by including both adult and child MA recipients and also provides program enhancements through specific contract requirements relating to service delivery. Tr. Mar. 25, 2005, at 8.

72.     Through the competitive procurement process, the Department selected McKesson as the ACCESS Plus contractor. The contract between the Department and McKesson contains specific requirements relating to the provision of dental services to all MA recipients, including classmembers.  McKesson must make outreach calls to MA recipients, as well as annual calls to MA children, to remind recipients to schedule a dental appointment and to provide recipients with the names of available dentists. McKesson is also required to schedule appointments with available dental providers, upon request by an MA recipient.  Tr. Mar. 24, 2005, at 8-10; Ex. D-1, at Attach. A, at 38-39.  Recruitment of dentists remains the task of DPW.  Tr. Mar. 24, 2005, at 19.

73.     The Department also requires care coordination between dental and behavioral health providers along with case management and disease management services for individuals requiring such.  Tr. Mar. 15, 2005, at 179; Tr. Mar. 24, 2005, at 8.

74.     McKesson is also responsible for creating a schedule to remind recipients to make their next dental appointment. When dental appointments are

made, McKesson is required to send a reminder notice to the MA recipient seven days in advance of the appointment in order to reduce "no show" rates.  Tr. Mar. 24, 2005, at 11-12.

## D. DPW's Dental Summits

75.    In May 1999, the Department, in partnership with the Pennsylvania Dental Association (PDA), convened a dental summit, which was attended by MA recipients, dental providers, the American Dental Association and various state and federal government offices.  Tr. Mar. 15, 2005, at 108-10.

76.    All attendees were directed to identify barriers to underutilization of dental services and make specific recommendations on how to eliminate the barriers. Tr. Mar. 15, 2005, at 110.

77.    In collaboration with the PDA, the Department implemented rate increases for certain pediatric and adult dental services. On January 1, 1999, certain rates were increased by an average of 80%.  On January 1, 2001, certain rates were increased by an average of 117%.  Tr. Mar. 15, 2005, at 117; Ex. D-55.

78.    In 1999, the Department met with a group of pediatric dentists, including Dr. Christopher J. Luccy, D.D.S., (a witness called by plaintiffs), who made recommendations concerning pediatric fee increases based on what the dentists received from third-party payers.  Tr. Mar. 15, 2005, at 117-18.  The

Department proposed increasing the pediatric dental codes to the levels recommended by the pediatric dentists and the legislature adopted those increases. Tr. Mar. 15, 2005, at 118.

79.     In 2001, the Department focused on adult recipients and contacted the PDA and asked which dental codes should be added, and which fees should be increased.  Tr. Mar. 15, 2005, at 118.  The Department subsequently adopted all of the increases recommended by the PDA except those that were more than 100% of the PDA's regional coding books.  Id.  Following these fee increases, the Department provided additional funds to the MCOs so each could increase its own provider rates.  Tr. Mar. 15, 2005, at 35.

80.     The Department also expanded dental services covered and made changes to administrative policies and adopted standard forms for dental provider billing purposes. All of the enhancements and changes were the direct result of the dental summit's priority recommendations. Specifically, the Department: (1) added periodontal services as a covered benefit; (2) added orthodontic services as a covered benefit; (3) increased coverage of periodic oral evaluation and prophylaxis from one to two times per year; (4) increased behavior management fee coverage from two per year to four per year; (5) simplified and expedited the dental provider MA enrollment process; (6) reduced prior authorization requirements; (7) adopted

-25-

the American Dental Association claim forms; (8) adopted the American Dental

Association procedure coding system; and (9) appointed a Chief Dental Officer.

Tr. Mar. 15, 2005; Ex. D-55.

81.     In addition to the specific enhancements to covered services, policies

and processes, the Department conducted an extensive education and outreach

campaign to MA recipients and dental providers. An MA recipient handbook was

developed and distributed to all recipients with detailed information on covered

services and information on how to obtain a dental appointment.  Tr. Mar. 15,

2005, at 133-34; Ex. D-4.  The handbook was also made available on the

Department's website.  See Ex. D-4.

82.     In July 2002, the Department distributed a brochure entitled "Finding a

Dentist" to all MA recipients to assist recipients, whether in managed care or

fee-for-service, with locating dentists and securing dental appointments.  Tr. Mar.

15, 2005, at 128; Ex. D-6.

83.     Additionally, a brochure entitled "Pennsylvania has Something to

Smile About" was sent to all licensed dentists.  The brochure contained information

on the dental initiatives undertaken by the Department in response to the dental

summit recommendations.  Tr. Mar. 15, 2005, at 126.

84.     A dental website for recipients and providers was also created in

response to the dental summit recommendations.  The website contains information

and contact numbers for individuals seeking dental services and also includes

information for providers regarding enrollment, billing inquiries and benefit

coverage.  There is also a specific section containing information for individuals

with special needs and accessing services.  Tr. Mar. 15, 2005, at 127-28; Ex. D-3.

     85.    One of the implemented recommendations from the dental summit was

the appointment of a Chief Dental Officer within the Department.  Dr. Paul

Westerberg, D.D.S., was hired in 2001 and was initially responsible for providing

technical assistance to the fee-for-service and HealthChoices programs in the areas

of prior authorization and monitoring.  Tr. Mar. 22, 2005, at 76.  Dr. Westerberg's

position has evolved into a project-oriented and policy-focused position where he

provides assistance to the Department of Health on community challenge grant

selections and participates in special dental projects in Pennsylvania.  Id. at 76-77,

80.

     86.    In June 2004, Dr. Westerberg assisted the Department in securing

funds through the State Action for Oral Health Access Program.  The funds

secured were used to provide additional money for enhanced services to

individuals with special needs at Action Health, a community-based organization

with a dental clinic.  Tr. Mar. 22, 2005, at 77, 86.

87.    Dr. Westerberg also obtained significant funding from the Department of Health challenge grant program for Welsh Mountain Medical and Dental Center, Berwick Health Clinic, Altoona Hospital, JC Blair Memorial Hospital, as well as dental clinics in Fulton, Clarion, Forest, Lancaster, Blair, Mifflin, and Juniata counties.  Tr. Mar. 22, 2005,at 88-95; Exs. P-12 through P-15, P-38, P-39, P-43 through P-45.

88.    Dr. Westerberg has initiated discussions with the three Pennsylvania dental school deans for the purpose of addressing workforce and curriculum issues.  Dr. Westerberg is hopeful that the discussions will determine what impact student recruitment, special needs curriculum and financial incentives may have on access to dental services in Pennsylvania for the special needs population.  Tr. Mar. 22, 2005, at 81-82.

89.    In response to a letter from CMS Director Timothy Westmoreland regarding dental services for children, the Department submitted an "Action Plan for Improving Access to Oral Health Services" to CMS.  Tr. Mar. 15, 2005, at 113; Ex. D-20.  The plan essentially outlined the initiatives undertaken or planned for implementation based on the dental summit recommendations. The action plan was subsequently approved by CMS and the Department has never been cited for noncompliance or denied federal funding regarding the provision of dental services.

<u>See</u> Tr. Mar. 15, 2005, at 171-72.

90.     Despite all these courses of action, even the fee increases, DPW saw little if any increases in the number of enrolled dentists.  <u>See</u> Tr. Mar. 25, 2005, at 149; Ex. D-23.

91.     Based on this prior experience, DPW officials do not believe the across-the-board rate increases suggested by plaintiffs would improve access for classmembers.

**E. DPW's Future Plans for the Medical Assistance Dental Program**

92.     DPW officials recognize that Pennsylvania was part of a dental services "crisis" in the late 1990's and that while that crisis has lessened, problems still persist with regard to ensuring adequate access to quality dental services.  <u>See,</u> <u>e.g.</u>, Tr. Mar. 15, 2005, at 144; Exs. P-4 at 1, P-23.

93.     Throughout the state, officials of DPW's County Assistance Offices have repeatedly stated, albeit in the context of the need for transportation grants, that there are large numbers of MA recipients seeking dental services who cannot find dentists willing to serve them.  <u>See</u> Exs. P-12 through P-17, P-38 through P-40, P-43 through P-45.

94.     DPW officials sincerely desire to eliminate access barriers to dental services for all MA recipients, including classmembers, and continue to experiment

with better ways to do so.

95.     Yet, like all states, Pennsylvania is losing federal support for its MA program and the federal Medicaid program has been targeted by the President and Congress for future cuts.  Tr. Mar. 24, 2005, at 14.  In the 2005/06 fiscal year, the MA program will also experience increased costs due to rising pharmaceutical expenditures and higher recipient enrollment.  Tr. Mar. 24, 2005, at 14.

96.     As a result of these factors, the Department needed an additional $1.2 billion for its 2005/06 budget.  Tr. Mar. 24, 2005, at 14.  The Department was forced to cut $600 million of services from its budget in order to absorb its share of the $1.2 billion shortfall.  Id.

97.     In order to absorb the $600 million, the Department has proposed cutting reimbursements to pharmacies, reducing supplemental payments to hospitals, and achieving deeper discounts from drug manufacturers.  Tr. Mar. 24, 2005, at 15. The Department has also proposed limiting MA services and increasing the number of co-pay services which require MA recipients to make an out-of-pocket payment to the provider.  Id.

98.     Unlike other states, however, the Department remains committed to providing dental services to as many MA recipients as possible. The Department has not proposed any co-pay arrangement for dental services, has not proposed

any fee limitations for providers of dental services or proposed lowering reimbursement rates for dentists.  Tr. Mar. 24, 2005, at 15.

99.    The Department has proposed "significant" fee increases for dental services specifically targeting the special needs population.  Tr. Mar. 24, 2005, at 15-16

100.    The Department proposed these targeted fee increases at the direction of Dr. Westerberg, as part of a continued long-term commitment to improve access to dental services that grew out of the dental summits in 1999 and 2001.  Tr. Mar. 24, 2005, at 16, 25.

101.    Since the Department has already increased reimbursement rates for children and adults to the levels requested by participating MA providers, the Department decided to address the special needs population in 2005/06.  These new proposed increases include raising the behavior management fee from $30 to $80 and increasing or initiating four fees that relate to general anesthesia and sedation.  Tr. Mar. 24, 2005, at 17-18. The Department has proposed initiating a new fee, previously not covered under the MA program, which allows dentists to bill for an extended period of time when treating recipients who require anesthesia. Tr. Mar. 24, 2005, at 17.

**F. Individual Plaintiffs' Experiences With Obtaining Dental Services**

102.    Once plaintiff Patricia Clark became eligible for the MA program in 1998, her sister Connie Clark received a list of 19 or 20 dentists from Patricia's county caseworker and contacted "4 or 5" before scheduling a dental appointment with Dr. Schmidt, an MA dental provider.  Tr. Mar. 15, 2005, at 69, 70-71.

103.    After several months, Dr. Schmidt stopped accepting MA patients, and Patricia was treated by Dr. Maryann Davis.  Tr. Mar. 15, 2005, at 76-77.  After being unable to locate an enrolled dentist to treat her sister, Ms. Clark paid out-of-pocket for these services.  Id.

104.    Ms. Clark then made the personal choice of continuing to send Patricia to Dr. Davis, and never again tried to locate a dentist enrolled in the MA program.  Tr. Mar. 15, 2005, at 84-85.  Ms. Clark testified that, at this time she did not know about the special needs unit at her sister's MCO, Best Health Plan.  Tr. Mar. 15, 2005, at 75.

105.    Ms. Clark was subsequently informed of Best's special needs unit by Patricia's county caseworker.  Tr. Mar. 15, 2005, at 79.  Once Ms. Clark became aware of the special needs unit, Best Health Plan began paying a small amount to Dr. Davis as an out-of network provider, even though she was not enrolled in the MA program.  Tr. Mar. 15, 2005, at 78-80.

106.    Plaintiff K.S. became eligible for the MA program in 1999.  Tr. Mar.

14, 2005, at 57.  The guardian of K.S., Ms. Priscilla Conrad, who resides in Port Treverton, Snyder County, had difficulty finding a dentist in her immediate area that accepted MA, even after getting a list of dentists from DPW, so she scheduled an appointment with her family dentist in December 1999.  Id. at 58-62.

107.   Ms. Conrad called the Kids Med Line and was given the names of two dentists in Harrisburg.  Tr. Mar. 14, 2005, at 62.  Ms. Conrad called the dentists and both were accepting MA recipients and were willing to treat K.S.  Id.  Ms. Conrad, however, did not schedule an appointment because she did not want to make "a three hour minimum time sacrifice" and "hated to pull K.S. out of her life skill program."  Id. at 62-63. Ms. Conrad testified that she did not make any further efforts to locate an MA provider and that she resumed taking her daughter to her family dentist.  Id. at 64-65.

108.   In March 2002, the Action Dental Health Clinic opened in Sunbury.  Tr. Mar. 14, 2005, at 66.  The Action Health Clinic is an MA facility dedicated to providing dental services to the MA population.  Id.  Ms. Conrad testified that she was able to secure a dental appointment at the clinic for K.S. and took her there several more times through February of 2004.  Id.  In July 2004, Ms. Conrad and her husband obtained dental insurance and K.S. is covered under that policy and no longer receives dental services from MA providers.  Id. at 67.

109.    Nilda Figueroa takes her daughter, plaintiff Sarah Carrasquillo, to the

dentist once a year for an oral examination. Tr. Mar. 24, at 44. Sarah received

dental services from Dr. Ross in 1994, and Dr. Freeman in 1995 and 1996. Id.  In

1997, Ms. Figueroa did not attempt to schedule an annual appointment for her

daughter because Dr. Freeman told her that dental services were not necessary at

that time. Id. at 45. Sarah again saw Dr. Freeman for her annual checkup in 1998.

Id.

110.    In 1999, Ms. Figueroa was told by Dr. Freeman that he no longer

accepted MA patients.  She could not find another dentist who would accept MA.

Tr. Mar. 24, 2005,at 38-39.  So, she called the Lancaster Cleft Palate Clinic and

was able to schedule a dental appointment for her daughter "within 3 or 4 weeks."

Id. at 37-38, 46.  Rather than let her daughter wait in pain for so long, Ms. Figueroa

decided to schedule an appointment with a Dr. Seldomridge, who was not enrolled

in the MA program.  Id. at 39.  Dr. Seldomridge performed surgery to remove all of

Sarah's teeth for a $50 fee due to a severe infection that Sarah had developed.  Id.

at 40.

111.    Ms. Figueroa testified that the Lancaster Cleft Palate Clinic called her a

month later and wanted to have Sarah come in for blood work.  Tr. Mar. 24, 2005,

at 40.  When Ms. Figueroa told the clinic that Dr. Seldomridge had just performed

the surgery, the clinic scheduled an appointment as a follow-up to the surgery. Id.
at 40-41.  Ms. Figueroa scheduled an appointment at the clinic in June 2000, and
that Sarah has not needed to access dental services since that time. Id. at 41, 50.

112.   Recently, Ms. Carrasquillo has developed a dental infection.  Ms.
Figueroa telephoned Gateway, an MCO contracted by DPW, and requested the
names of dentists.  She was given the names of eight dentists, called all eight, and
was unable to secure any services.  Five of the dentists referred by Gateway did
not accept MA patients, and three did not return her calls.  Tr. Mar. 24, 2005, at
42-43.

113.   Ms. Figueroa called Gateway again, and was given the names of two
more dentists.  When she called them, neither of them would see her daughter.  Tr.
Mar. 24, 2005, at 43.

114.   Audrey Coccia, the mother of Gina Coccia, testified that when Gina
became eligible for MA, she contacted two dentists who could not treat her
daughter because they could not administer sedation.  Tr. Mar. 14, 2005, at 38. Ms.
Coccia indicated that it became clear to her that because of her daughter's severe
mental retardation and other medical and psychological problems there "weren't
any options other than going to one of the specialty centers that the Department of
Welfare set up."  Id. at 38.

115.   Ms. Coccia scheduled three appointments for Gina without difficulty at one of the specialty clinics, Special Smiles.  The first two appointments "went relatively well."  Tr. Mar. 14, 2005, at 39.  Ms. Coccia became upset at Gina's third appointment because the treating dentist suggested that they remove Gina's teeth because of her medical conditions.  At the third appointment, Gina would not allow the dentist to examine her mouth so the appointment was re-scheduled to allow for sedation to be administered.  Id. at 39-40.

116.   Gina's follow up appointment took place one month later at Special Smiles. When the Coccia's arrived for the appointment, Ms. Coccia reminded the Special Smiles' staff that Gina needed pre-sedation because of her anxiety and the fact that Gina is "very difficult.  She would not cooperate in any fashion . . . it could take five or six people to hold her down just to try to go into her mouth, no less to get her into an [operating room]."  Tr. Mar. 14, 2005, at 41.  The treating dentist indicated he would not pre-sedate Gina, and instead, restrained her and put her on a table to put her under sedation.  Id. at 42-43.

117.   Ms. Coccia then had a follow up meeting with the Special Smiles executive director regarding her dissatisfaction with Gina's treatment in the operating room.  The executive director, a Dr. Mark Goldstein, told her "he would try to rectify what had happened and see that it never happened again."  Tr. Mar.

14, 2005, at 45.  In response to questions regarding further dental services for Gina, Ms. Coccia testified that she made no further inquiries regarding the availability of a dentist for Gina because "I was hoping this Special Smiles was going to do some of the things that they promised me and that I could probably take her back there." Id. at 50.

## G. Comparative Availability of Dental Services

## 1. Statistical Distribution of Dentists

118.   The population in the Commonwealth of Pennsylvania is approximately 12.8 million individuals.  Tr. Mar. 22, 2005, at 98.

119.   There are approximately 895,534 individuals who are under age 21 and eligible for MA dental services.  Factual Stips., at ¶26.

120.   There are approximately 472,485 individuals who are age 21 and older who are eligible for MA dental services.  Factual Stips., at ¶27.

121.   There are approximately 8,031 dentists licensed to practice in Pennsylvania.  Factual Stips., at ¶28.

122.   The number of dentists practicing in Pennsylvania is declining.  See, e.g., Tr. Mar. 23, 2005, at 114.  This decline mirrors the nationwide trend.  Id.

123.   Approximately 5,764, or 72% of the 8031 dentists licensed to practice in Pennsylvania are enrolled in the MA program.  Factual Stips., ¶29.

124.    Participating dentists may limit the number of patients they treat to a very small number, even as low as one patient per year.  Factual Stips., at ¶30; Tr. Mar. 15, 2005, at 92.

125.    "Enrolled" means only that the dentists have done the paperwork necessary to bill in the MA system, not that they actually provide any services to MA recipients.  Tr. Mar. 15, 2005, at 91-92.

126.    A dentist who "participates" in the MA system is defined as one who has submitted at least one bill for services in the past year.  Tr. Mar. 15, 2005, at 92.

127.    DPW does not collect any data which would show, or from which could be calculated, the number of Full Time Equivalent dentists who are actually available to provide dental services to MA recipients during the last five years. Factual Stips., at ¶36.

128.    DPW has not requested or received any data from any MCO which would show or establish the number of Full Time Equivalent dentists actually available to provide services to MA recipients in any county or MCO area.  Factual Stips., at ¶37.  Of the 8,031 total dentists in Pennsylvania, only 1,254, or 15%, "participate" to any degree in the fee-for-service system.  Ex. P-8, at 2.

129.    The Federal Government, upon application, will designate an area a

"Federally Designated Dental health Professional Shortage Area" upon a showing that the area has less than one available dentist for a population of 4,000 low income patients.  Factual Stips., at ¶31.

130.   There are many dentists in Pennsylvania who will provide services to MA recipients, but do not enroll and participate in the program, to avoid being inundated with large numbers of additional patients. Ex. P-48, at 67-68.  These volunteered services do not appear in any of the statistical evidence presented in this case.

131.   Some providers participate in larger projects designed to maximize effectiveness and efficiency by treating many individuals as part of a targeted program. Trial Tr. Mar. 22, 2005, at 81.  One such special project, with the Philadelphia School District, was called the Philly Smiles Program.  Id. at 80-81.  Under this program, dentists provided free, comprehensive, dental examinations including dental screenings, dental cleanings, digital radiographs, fluoride treatments and dental sealants for 600 Philadelphia school children. Id. Children identified to be in need of more extensive dental services were referred to dental providers identified by the HealthChoices MCOs in Philadelphia.  Id.

132.   Many clinics, whether free clinics, safety net providers or federally qualified health centers, submit a different type of reimbursement claim form which

is not considered a claim for dental services under the MA program.  Tr. Mar. 22, 2005, at 61.

## 2. Utilization

133.    Utilization rates only measure the number of recipients who are accessing services, and do not show why certain individuals are not accessing services.  Tr. Mar. 23, 2005, at 56.  Utilization rates do not reveal how many individuals attempted to access services but, for whatever reason, could not do so.  Tr. Mar. 23, 2005, at 56.

134.    Nonetheless, DPW's monitoring reports show low utilization rates for dental services by MA recipients.  See Exs. P-25 through P-29.

135.    DPW's monitoring reports for its Health Partner's MCO, and its competitors show that during 1999 through 2001, preventive care utilization rates ranged between 13% and 23%.  Ex. P-25, at 6.

136.    DPW's monitoring reports for its Three Rivers MCO, and its competitors show that during 1999 through 2001, preventive care utilization rates ranged between 3% and 31%.  Ex. P-26, at 5.

137.    DPW's monitoring reports for its Americhoice MCO, and its competitors show that during 1999 through 2001, preventive care utilization rates ranged between 13% and 23%.  Ex. P-27, at 6.

138.   DPW's monitoring reports for its Keystone Mercy MCO, and its competitors show that during 1999 through 2001, preventive care utilization rates ranged between 13% and 23%.  Ex. P-28, at 6.

139.   DPW's monitoring reports for its Gateway MCO, and its competitors show that during 1999 through 2001, preventive care utilization rates ranged between 3% and 33%.  Ex. P-29, at 7.

140.   Other data admitted into evidence suggests "[i]n Federal Fiscal Year 1999, only 21% of eligible children under age 21 received any dental services, and only 17% received any preventive dental care."  Ex. P-1, at 11.

141.   There are, however, many reasons why MA recipients do not access dental services.  For example, many recipients do not recognize the importance of oral health, only visit a dentist when a specific health problem arises, do not recognize the importance of seeking preventive services for children with baby teeth, and are afraid to visit the dentist.  Tr. Mar. 23, 2005, at 57.  "The barriers included fear of dentists, language barriers and lack of education on oral health issues, including education on the need to care for baby teeth."  Ex. P-1, at 18.

142.   The General Accounting Office's report to Congress concluded that individuals are often not aware of the importance of oral health and do not attempt to access services until a dental problem becomes painful.  The report goes on to

discuss problems specific to MA recipients:

> Other factors affecting the use of dental care include characteristics that may be unique to or more prevalent in the Medicaid or low income population. Issues that are minor inconveniences for higher income patients such as getting time off from work to visit the dentist, arranging transportation to the dentists, especially in rural areas, or finding childcare can be major barriers for many low income patients.

Ex. D-21, at 15.

143.   Moreover, the utilization rates cited by plaintiffs are based on encounter data, whereby a provider submits a claim to an MCO, the MCO captures specific data and transmits it in a different form to the Department.  Tr. Mar. 23, 2005, at 60.  Immediately after the HealthChoices program was implemented, MCOs had difficulty providing encounter data to the Department.  Tr. Mar. 21, 2005, at 133-34.

144.   Subsequently, the Department had difficulties receiving encounter data because its computer system was not prepared to accept the electronic files.  Tr. Mar. 21, 2005, at 134.  The Department had more difficulties accepting the data when it implemented a different claims processing system.  Id.

145.   The data supplied is from the early years of managed care in Pennsylvania, before the Department fully utilized its monitoring mechanisms, and before the Department required each MCO to submit corrective action plans for

improving the utilization of dental services.  <u>See</u> Tr. Mar. 23, 2005 at 60-69.

146.   As to the fee-for-service program, although AHS reported it successfully assisted 98% of callers inquiring about dental services, AHS also recognizes that there are not enough dentists in the fee-for-service program to provide services to MA recipients.  <u>See</u> Tr. Mar. 15, 2005, at 96; Tr. Mar. 23, 2005, at 69-70.

147.   Individual plaintiffs encountered some difficulty in obtaining dental services, <u>see</u> <u>supra</u> Part I.G.

## 3. Reimbursement Rates

148.   Plaintiffs' expert witness, Dr. Crall, D.D.S., Sc.D., opined that:

> DPW has not assured that payments for Medical Assistance dental services are consistent with efficiency, economy, and quality of care and sufficient to enlist sufficient providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.

Ex. P-32. at 11; <u>see</u> Tr. Mar. 21, 2005, at 25.

149.   Dr. Crall based his opinion upon an analysis which compared the rates paid to dentists by DPW in its fee-for-service system and HealthChoices regional MCOs to the rates charged by private dentists.  First, Dr. Crall compared DPW's dental rates to the rates published by the American Dental Association (ADA) for the Mid-Atlantic Region.  Second, he compared DPW's rates in each DPW region

of the state to the rates charged in those same regions.  Ex. P-46; see Tr. Mar. 21,

2005, at 48-51.

150.   The rationale behind a percentiles analysis is that it could reflect what

proportion of dentists would accept a given fee.  Tr. Mar. 21, 2005, at 38.  For

instance, if DPW paid a rate that was at the 10th percentile of dentists' fees,

presumably, only 10% of dentists would provide services at that rate; conversely,

the rate would be insufficient to attract the remaining 90% of dentists, who normally

accept rates higher than that paid to the lowest 10th percentile of dentists' fees.  Tr.

Mar. 21, 2005, at 32.

151.   As indicated by CMS, the "[u]se of 'percentiles' is exceptionally

helpful for Medicaid Programs as they enable estimation of the number of dentists

in the State who might participate in Medicaid, given any chosen constellation of

medical fees."  Ex. P-41, Tab A, at 4.  CMS also recommended that, based on

input from the ADA, states should aspire to set their reimbursement rates at the 50th

to 75th percentile of what dentists charge regionally.  Id.; see id. at 2.

152.   Dr. Crall first compared DPW's fee-for-service dental rates to the

published ADA Mid-Atlantic rates.  His calculations demonstrated that on average,

DPW's fee-for-service payments amount to approximately 80% of the fees charged

by the lowest 10th percentile of dentists (i.e., those dentists whose charges were

among the lowest 10% of dentists' charges).  Ex. P-32, at 11-12; see Tr. Mar. 21, 2005, at 32.

153.   Dr. Crall did a similar rate analysis comparing DPW's HealthChoices MCO rates paid to dentists to the ADA Mid-Atlantic regional rates.  The results were nearly the same.  Ex. P-32, at 13.

154.   Collectively, these comparisons indicate payment structures for PA Medicaid fee-for-service and managed care dental programs are markedly below area market rates, below breakeven levels even for "average" patients, and not likely engage more than a small percentage (less than 10%) of dentists from an economic perspective . . . ."  Ex. P-32, at 13-14; see Tr. Mar. 21, 2005, at 42-43.       155.

Dr. Crall also did a much more geographically focused rate analysis.  He compared the rates paid by DPW in each of its fee-for-service and HealthChoices regions of the state to the rates charged in those same regions.  Ex. P-46; see Tr. Mar. 21, 2005, at 48.

156.   Dr. Crall's analysis demonstrated that DPW's HealthChoices MCOs were paying dentists between 37% and 63% of the 50th percentile rates.  Ex. P-46, at 1; see Tr. Mar. 21, 2005, at 50-51.  Based on this data, Dr. Crall concluded that these rates were at the 10th percentile of dentists' fees, meaning that less than 10% percent of the dentists in the HealthChoices zones would accept such fees.  Ex. P-

46, at 1-2; <u>see</u> Tr. Mar. 21, 2005, at 51-52, 56-60.

157.   Dr. Crall's comparison between the rates paid by the fee-for-service program to the 50th percentile of private insurance payments to dentists had the same result.  He found that DPW's fee-for-service dental rates were between 63% and 65% of the 50th percentile rates.  Ex. P-46, at 2; <u>see</u> Tr. Mar. 21, 2005, at 52-53.  These rates were also at the 10th percentile -- so low that they were not likely to attract 10% of the dentists in those regions of the state. Ex. P-46, at 2; <u>see</u> Tr. Mar. 21, 2005, at 51-53.

158.   For his general and specific regional analyses, Dr. Crall concluded that rates at or below the 10th percentile would not even cover the overhead cost of providing services for "average" patients for roughly 90% of PA general dentists." Ex. P-32, at 12; <u>see</u> Tr. Mar. 21, 2005, at 33.  This conclusion is reached on overhead costs constituting 60% to 70% of dentists' fees.  Ex. P-32, at 12; <u>see</u> Tr. Mar. 21, 2005, at 33.  Therefore, if DPW's rates are about 80% of what the 10th percentile of dentists charge, those dentists are only making a small profit (i.e., the difference between their overhead, 60% to 70% of their fees, and what DPW is paying, 80% of their fees, or about 10% to 20% of profit).  <u>See</u> Tr. Mar. 21, 2005, at 111-12.

159.   DPW's expert, Ms. Catherine Sreckovich, offers a counterbalances to

Dr. Crall's conclusions.  Based on more than twenty years experience working for the Health Care Finance Administration (the predecessor to CMS) and performing rate setting for state Medicaid programs, she is convinced that "the association of fees with percentile of charges is highly inflationary and is really not consistent with efficiency and economy."  Tr. Mar, 23, 2005, at 33-34.  She also believes that the ratio of dentists servicing the eligible MA recipient population is not so stark when compared to the ratio of dentists servicing the general population.  <u>See</u> Ex. D-55, at 30-31, <u>see also</u> Ex. D-43.

160.   Dr. Crall described overhead costs as excluding a dentist's compensation, but including "the cost of space, personnel, equipment, supplies, etc."  Ex. P-32, at 12.  Ms. Sreckovich conducted a more precise analysis of dentists' costs in which she essentially broke overhead costs out into fixed expenses (e.g., staff salaries, rent, insurance, etc.)[4] and variable expenses that vary from procedure to procedure and patient to patient (e.g., dental supplies, commercial laboratory fees, drugs, etc.).  Ex. D-41, at 2.

161.   MA reimbursement rates in DPW's fee-for-service program exceed

_____

[4] Because Dr. Crall did not include dentists' salaries as a component of overhead, Ms. Sreckovich did not include dentists' salaries as a component of fixed expenses.  <u>See</u> P-32, at 12, D-55, at 24 n.82.

the variable costs of the 15 procedures identified in Dr. Crall's report.  Ex. D-41;

see Tr. Mar. 23, 2005, at 43.  This shows that dentists are not necessarily losing

money on a Medicaid patient, and that they have some incentive to treat Medicaid

patients. This is because the reimbursement rates cover the variable expenses as

well as some of the fixed expenses and overhead that the dentist is incurring.  Ex.

D-55, at 24-25; see Tr. Mar. 23, 2005, at 43-44.

162.   Notably, just because a dentist charges fees in the 75th percentile, for

instance, does not mean his overhead costs, particularly his variable expenses (as a

component of overhead costs), is higher than dentists charging fees in lower

percentiles.  Tr. Mar. 23, 2005, at 35.

163.   At bottom, it would be more profitable for a dentist to serve an MA

patient than to be idle and to have an empty chair.  Tr. Mar. 23, 2005, at 43-44.

164.   As recognized by Ms. Sreckovich, Dr. Crall did not factor the

behavior management fee into his analysis.  Ex. D-55, at 23; see Tr. Mar. 21, 2005,

at 105-10; Tr. Mar. 23, 2005, at 32-33.

165.   The behavior management fee allows dentists to receive extra payment

for MA recipients who are difficult to treat, including patients with mental

retardation.  Tr. Mar. 15, 2005, at 122, 125.  The behavior management fee is

available for each recipient up to four (4) times per calendar year, although a dental

-48-

provider may bill the Department an unlimited number of times if additional dental

visits are medically necessary.  Tr. Mar. 22, 2005, at 96-97.  The fee is available to

providers in both fee-for-service and managed care counties.  Tr. Mar. 23, 2005, at

94-95.

166.   The behavior management fee is available to "individuals with

developmental special needs who had those special needs before the age of 21."

Tr. Mar. 23, 2005, at 95.  The Department will also pay the fee under the

exceptions process "to any individual who may qualify under special

circumstances."  Id.  No evidence was presented as to the frequency DPW pays

for special circumstances.

167.   Program exception requests can be made for items or services not

covered on the Medical Assistance Fee Schedule and can also be made to request

a particular fee or fee adjustment.  Tr. Mar. 22, 2005, at 96-97.  Providers may

request an increase for a particular service, above what is listed in the fee schedule,

based on the "particular situation or extenuating circumstances."  Id.  The

Department reviews and grants provider requests on a case-by case basis.  Id. at

96.  No evidence was presented as to how frequently DPW pays outside the fee

schedule.

168.   Prior to July 1, 2005, the behavior management fee was $30.  As of

July 1, 2005, the fee increased to $80.

169.   Adding the behavior management fee to each of the 15 individual procedures examined in Dr. Crall's report would effectively put DPW's rate above the 75th percentile for a majority of the codes Dr. Crall analyzed.  Ex. D-32, at 12. Of course, the benefit of the behavior management fee diminishes in inverse proportion to the number of procedures performed per visit because the fee is only available on a per visit basis.  That is, the more procedures a dentists performs per visit, the less the benefit of the behavior management fee will be felt.  Tr. Mar. 21, 2005, at 107-08.

170.   Little evidence was presented comparing the rates paid by DPW to the private rates of reimbursement paid by public and private insurers.  The majority of Dr. Crall's analyses concerned dentists' commercial charges.  Tr. Mar. 23, 2005, at 104.  Insurers do not always pay dentists the full amount they charge for dental services.  See id. at 104-05.

171.   Only one dentist, Dr. Luccy, testified that when he treated patients without insurance who paid for services out of pocket, he received 100% of his Usual and Customary Rate (UCR).  Tr. Mar. 15, 2005, at 37.  When Dr. Luccy was paid by a private indemnity insurance plan, he was paid 100% of his UCR.  Tr. Mar. 15, 2005, at 38.  When Dr. Luccy was paid by a preferred provider

-50-

organization, he was paid 85% to 93% of his UCR.  Tr. Mar. 15, 2005, at 38-39.

However, when Dr. Luccy provides services for MA recipients, and is paid by the

fee-for-service system or by DPW's HealthChoices program, he receives only 59%

of his UCR.  Tr. Mar. 15, 2005, at 39, 61.

172.    Since Dr. Luccy's overhead is 72% of his UCR, and DPW pays him

59% of his UCR, he claims he loses money each time he provides services to an

MA recipient.  Indeed, according to Dr. Luccy, he is subsidizing services to MA

recipients, and in the past year he was forced to write off losses due to this rate

disparity by an amount equal to his total payroll.  Tr. Mar. 15, 2005, at 47.

173.    Nonetheless, no other evidence suggests what private and public

insurers routinely pay dentists and compares those payments to Pennsylvania's MA

rates.

174.    Instead of using a percentile analysis, the Department sets its rates by

meeting directly with dental providers and asking them to determine what rates are

fair and reasonable.  Tr. Mar. 15, 2005, at 160-61.  Contracted managed care

organizations negotiate rates for dental services directly with providers.  Id. at 97.

175.    The Department implemented significant fee increases in both 1999

and 2001, in conjunction with other dental reforms, at the request of providers, MA

recipients and advocates, and saw no measurable increase in provider enrollment.

Tr. Mar. 15, 2005, at 121, 149; <u>see</u> Ex. D-42.  Suzanne Love, former Director of the Department's Bureau of Policy, Budget and Planning, testified that after the Department increased fees, eliminated all of the identified barriers to service, and "literally did what [the dentists] asked" there was still not a noticeable increase in provider enrollment.  Tr. Mar. 15, 2005, at 170.

176.    The Department's 2001 fee increases were "significant," and Dr. David E. Shapter, a PDA member, wrote to fellow dentists in the PDA newsletter that "the fee increases are very competitive with the private insurance industry and have leveled the playing field significantly."  Tr. Mar. 15, 2005, at 53; Tr. Mar. 23, 2005, at 48; Ex. D-52.  Yet, in the eight months following the Department's January 2001 fee increases, a net-gain of only 33 providers enrolled in the program.  Tr. Mar. 23, 2005, at 47-48; Ex. D-23.

177.    The few areas of the state that experienced slight increases in provider enrollment were in zones that operated under managed care.  Tr. Mar. 15, 2005, at 121-122.  Between 2001 and 2004, the Department did not propose to raise dental fees because it did not believe that, based on the results of previous increases, it could convince the Governor's Budget Office that raising fees would have a noticeable impact on access and utilization.  Tr. Mar. 15, 2005, at 174.

178.    In its report to Congress on oral health services to low-income

populations, the HHS Office of the Inspector General states that the data from states that have raised fees shows that "access and utilization do not increase proportionally."  Ex. D-25, at 9.

179.   The General Accounting Office's Report to Congress dated September 2000, states that only 14 of the 40 states that implemented rate increases experienced increases in utilization and "[m]ost states that reported increases in dental utilization had only marginal increases, such as increases in dental utilization of less than three percentage points."  Ex. D-21, at 13.

180.   None of the states cited by Dr. Crall as experiencing an increase in utilization rates provides comprehensive dental coverage to adults.  Ex. D-51.

181.   Instead of increasing access, states that impose significant fee increases have been forced to cut adult services to finance the increases.  By cutting adult services, these states have decreased access for MA recipients as a whole and essentially provide no access to their adult population, other than in statutorily mandated emergency situations.  See Tr. Mar. 23, 2005, at 79-80; see also Ex. D-25, at 9.

182.   Some states have limited children's services to finance fee increases. Ex. D-25, at 9.

183.   Cutting adult services would have a significant impact on the special

needs population.  Nationally, "more than half of the persons with severe special

needs are between 22 and 64 years of age."  Ex. D-48, at 2.

184.   When states such as Alabama, Tennessee, South Carolina, and other

states cited by Dr. Crall, substantially increased reimbursement rates for children's

services, they essentially eliminated access to dental services for more than half of

their special needs population.  Tr. Mar. 23, 2005, at 79.

185.  Following the imposition of the Clark v. Kizer, 758 F. Supp. 572, 576

(E.D. CA, 1990), aff'd in relevant part sub nom., Clark v. Coye, 967 F.2d 585 (9th

Cir. 1992), remedy in 1991, California's annual dental expenditures increased from

$150 million in 1991 to $750 million in 1995.  Tr. Mar. 23, 2005, at 52; see Ex.

D-25, at 9.  Despite spending an additional $600 million on its dental program,

California saw minimal increases in enrollment and "utilization continued to lag

behind."  Tr. Mar. 23, 2005, at 53; see Ex. D-25, at 9.

186.   In the Governor's 2005/06 budget, the Department reiterated its

commitment to maintaining the current level of dental coverage, and despite a

particularly tight budget year, has proposed no limitation on comprehensive adult

services, instituted no co-pay arrangement for dental services, and actually

increased dental provider reimbursement rates for the codes that specifically target

the special needs population.  Tr. Mar. 24, 2005, at 15-16.  However, DPW

-54-

intimates that if it was forced to increase reimbursement rates, it would have to cut adult dental services from the MA program, which would result in more than 75% of classmembers losing their non-emergency dental coverage.  Tr. Mar. 23, 2005, at 79.  Still, the question is whether Pennsylvania is violating the equal access provision, not whether Pennsylvania will have to cut services if it is found out of compliance.

187.   Since the limited 1999 and 2001 fee increases did not increase provider participation, DPW officials have concluded from this experience that rate increases do not necessarily increase the number of providers willing to provide services to MA recipients.  Tr. Mar. 14, 2005, at 84; Tr. Mar. 15, 2005, at 170.

188.   DPW has attempted a variety of methods of increasing access to dental care by means other than raising rates to market levels, and these methods have all failed.

189.   According to DPW officials:

The Department has made great strides to encourage dentists to participate in our program, such as increasing fees, eliminating many prior authorization limits, accepting the ADA claim form and using the CDT four coding structure as well as continuing to accept as many industry standards as our regulations allow.  To date, these changes have not resulted in the dental enrollment increase we envisioned.

Tr. Mar. 14, 2005, at 86.

190.    Suzanne Love, a top DPW official testified that there was a crisis before DPW implemented the reforms, and one after the reforms were implemented.  Tr. Mar. 15, 2005, at 144-45.

191.    There is statistical support for the conclusion that DPW's initiatives to increase access have failed.  Data from DPW's Managed Care and fee-for-service billing records during the period 2001-2002 show that substantially fewer MA recipients are receiving dental services from DPW's system over time.  Ex. P-20, Tab C, at 5.

192.    According to these data, 243,540 children and adult classmembers received no dental services from either DPW's fee-for-service or managed care systems in 2001. Ex. P-20, Tab C, at 5.

193.    There were 285,332 children and adults who received no dental services from DPW's fee-for-service or managed care systems in 2002, an increase of 17.2%.  Ex. P-20, Tab C, at 5.

194.     The number of classmembers who received no dental services from DPW's fee-for-service system increased by 17.7% between 2001 and 2002.  Ex. P-20, Tab C, at 5.

195.    The number of classmembers who received no dental services from DPW's managed care system increased by 16.9% between 2001 and 2002.  Id.

196.   If DPW's initiatives to increase utilization, such as narrow, targeted fee increases, eliminating certain prior authorization requirements, and using updated computerized billing forms were effective, these data would show increases utilization to the system, not decreases.  Tr. Mar. 21, 2005, at 60-61; Tr. Mar. 14, 2005, at 86.


## H. Early and Periodic Screening, Diagnostic, and Treatment (EPSDT) Services

197.   In administering the requirements under the EPSDT provisions, the Department has published and maintains a periodicity schedule which was adopted "after consultation" with the Pediatric Dental Association and the Academy of Pediatric Physicians.  Tr. Mar. 15, 2005, at 141-42; Ex. D-9.  The Department's periodicity schedule provides timelines for the provision of medical services to children, including dental, and outlines the frequency by which each child should undergo tests, exams, and receive shots.  Tr. Mar. 15, 2005, at 141.

198.   The HealthChoices Standard Agreement requires MCOs to meet the federal guidelines related to the EPSDT program, a federally mandated program for individuals under the age of 21. Tr. Mar. 16, 2005, at 23; Ex. D-53, at Sub-Ex. J.

199.   DPW's periodicity schedule does not include any timeliness standards

for how long children must wait for services in fee-for-service and HealthChoices areas of the state.  Tr. Mar. 15, 2005, at  94; Tr. Mar. 24, 2005, at 25-26.

## II. Conclusions of Law

### A. Plaintiffs' Equal Access Challenge

Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v, (Title XIX, or the Medicaid Act), established the Medicaid program in 1965 as a cooperative federal-state program through which various health care services, including certain dental services, are provided to indigent, elderly and disabled individuals.  "If a state chooses to participate in the program, it must comply with the Medicaid Act and implementing regulations."  Pa. Pharm. Ass'n v. Houstoun, 283 F.3d 531, 533 (3d Cir. 2002) (en banc) (citing Wilder v. Virginia Hosp. Ass'n, 496 U.S. 498, 502 (1990)).  Under the Medicaid program, states may pay for certain enumerated services and may pay for additional services.  See 42 U.S.C. § 1396a(a)(10)(A); 42 C.F.R. §§ 440.210, 440.220, 440.225.  Each year, the federal government allocates funds to participating states "for the purpose of enabling each State, as far as practicable under the conditions in such State," to furnish Medical Assistance to eligible individuals.  42 U.S.C. § 1396.  Under Title XIX, a participating state must designate a "single State agency to administer or supervise the administration of the [state Medicaid] plan."  42 U.S.C. § 1396a(a)(5).

Pennsylvania participates in Title XIX. The Department of Public Welfare (DPW, or the Department) is the designated single state agency and must prepare a medical assistance plan consistent with federal law and submit it to the Centers for Medicare and Medicaid Services (CMS) of the United States Department of Health and Human Services (HHS) for approval.  42 C.F.R. § 430.10.  The Commonwealth's plan is known as the Medical Assistance (MA) program.

Dental services for children under the age of 21 are mandatory services while non-emergency dental services for adults are optional services that the Commonwealth has elected to offer under its plan.  See 42 U.S.C. § 1396a(a)(10); 42 U.S.C. § 1396d(a)(4)(B); 42 U.S.C. § 1396d(r)(3)(B); see also Tr. Mar. 24, 2005, at 16.  Pennsylvania is one of only thirteen states that provides comprehensive coverage for adults. FOF ¶6.

Upon approval of its plan by CMS, a state becomes eligible for federal matching funds for reimbursement of the cost of specific types of medical care and services so designated in the plan.  42 U.S.C. § 1396a(a).  CMS has approved the Department's state plan and the Department has never been cited for noncompliance or denied federal funds for noncompliance by CMS.  FOF ¶6.

The "equal access" provision of Title XIX, 42 U.S.C. § 1396a(a)(30)(A), mandates that the Commonwealth must assure that payments for care and services

are "consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area[.]"  As the court remarked earlier, see Clark, 339 F. Supp. 2d at 643, procedurally, a state must consider efficiency, economy, and quality of care in establishing reimbursement rates.  See Minnesota Homecare Ass'n, Inc. v. Gomez, 108 F.3d 917, 918 (8th Cir. 1997); Methodist Hosps., Inc. v. Sullivan, 91 F.3d 1026, 1031 (7th Cir. 1996); Arkansas Med. Soc'y, Inc. v. Reynolds, 6 F.3d 519, 530 (8th Cir. 1993); see also Rite Aid of Pa., Inc. v. Houstoun, 171 F.3d 842, 853-54 (3d Cir. 1999).  Substantively, a state must ensure that its state plan incorporates adequate reimbursement rates to enlist a sufficient number of dentists to assure that dental care is available to MA recipients to the same extent and quality of care as dental care available to the general population in certain geographic areas.  See Rite Aid, 171 F.3d at 853. The equal access provision is results-oriented in that it does not require any particular process to follow when establishing rates.  See id.  So long as the Commonwealth considered the appropriate factors enunciated by Congress, the Commonwealth cannot be said to have acted arbitrarily and capriciously as a procedural matter.  See id. at 853-54.

Plaintiffs argue that the Commonwealth violated and continues to violate the

-60-

equal access provision by maintaining reimbursement rates so low that

Pennsylvania is in noncompliance with the substantive requirement of the equal

access provision, i.e., Pennsylvania's reimbursement rates are insufficient "to enlist

enough providers so that care and services are available under the plan at least to

the extent that such care and services are available to the general population in the

geographic area[.]" 42 U.S.C. § 1396a(a)(30)(A).  Such substantive claims are

actionable by MA recipients via 42 U.S.C. § 1983, as we so ruled previously.  See

generally Clark, 339 F. Supp. 2d at 638-40, 643-44 (citing Sabree ex rel. Sabree v.

Richman, 367 F.3d 180, 193-94 (3d Cir. 2004) (Sabree II), rev'g, Sabree ex rel.

Sabree v. Houstoun, 245 F. Supp. 2d 653 (E.D. Pa. 2003) (Sabree I), and Rite Aid,

171 F.3d at 853-54).

    After examining the equal access provision's structure and legislative history,

the court ruled earlier that "counties, or the multi-county services zones established

by DPW, are the pertinent geographic areas to consider for plaintiffs' equal access

challenge."  Clark, 339 F.3d at 644-45.  To determine whether the level of access to

dental services enjoyed by classmembers equals the level of access to dental

services enjoyed by the general population in the pertinent geographic areas, the

court stated that it would look to the following non-exhaustive list of factors: (1) the

level of reimbursement to participating dentists in the market and the costs of

providing such services; (2) the level of dentist participation in the MA program; (3) whether there are reports that recipients are having difficulty obtaining care; (4) whether the rate at which MA recipients utilize dental services is lower than the rate at which the generally insured population uses those services; and (5) whether DPW agents have admitted that reimbursement rates are inadequate.  See Clark v. Kizer, 758 F. Supp. 572, 576 (E.D. Cal. 1990), aff'd in relevant part sub nom., Clark v. Coye, 967 F.2d 585 (9th Cir. 1992).  Many different considerations fall under each of these five overarching factors.  Nonetheless, for ease of presentation we will frame our analysis in terms of these five factors and will reach conclusions of law with respect to each factor.

## 1.  The Level of Reimbursement Rates

Dr. Crall's report and testimony, taken alone, paint a bleak comparison of Pennsylvania's reimbursement rates as compared to the rates normally charged by dentists in the Mid-Atlantic region.  FOF ¶¶149, 152-58.  Dr. Crall's supplemental analysis reveals that the rates normally charged by dentists in the Mid-Atlantic region closely approximates the rates normally charged by dentists in discrete areas within Pennsylvania (these areas, of course, are the pertinent geographic areas for comparison).  FOF ¶155.  Given that the results of Dr. Crall's supplemental Pennsylvania regional analysis mirrored the results of his Mid-Atlantic regional

analysis of reimbursement rates, we accept both data as fit bases for an opinion on the level of access enjoyed by MA recipients and those in the general population of the pertinent geographic areas.  See Clark, 339 F. Supp. 2d at 645-46 (discussing type of evidence plaintiffs must put forth to proceed with their equal access challenge).

Dr. Crall's analyses suggest that most reimbursement rates in Pennsylvania barely equal the rates normally charged by dentists in the 10th percentile; i.e., only 10% of dentists in Pennsylvania would consider Pennsylvania's reimbursement rates equal to or greater than their normal charges.  See FOF ¶156.  Conversely, 90% of dentists in Pennsylvania would charge more than what the dentists in the 10th percentile charge.  If we accepted Dr. Crall's analyses and assumed that 90% of dentists would neither participate nor enroll in the MA program because the reimbursement rates are too low, then clearly Pennsylvania's reimbursement rates would be insufficient to attract a sufficient number of dentists.

Dr. Crall's analyses cannot be viewed in isolation, however.  Ms. Sreckovich critically examined Dr. Crall's approach, specifically his estimation of dentists' overhead costs.  FOF ¶¶160-63.  She demonstrated that dentists' overhead costs

are not a static component of every charge.[5]  Ms. Sreckovich also noted that Dr.

Crall compared Pennsylvania's MA reimbursement rates to Pennsylvania dentists'

"commercial charges"; Dr. Crall did not compare Pennsylvania's MA

reimbursement rates to the rates at which insurers of private and public insureds

reimburse dentists.  FOF ¶¶170, 173.

As this court noted before, an inquiry into equality of access to dental

services involves a comparison between the level of access to dental services

enjoyed by MA recipients and the level of access to dental services enjoyed by

individuals with private or public insurance.  Clark, 339 F. Supp. 2d at 645

(examining legislative history of the equal access provision, H.R. Rep. No. 101-

247, 390-91, reprinted in 1989 U.S.C.C.A.N. 1906, 2116-17).  Insurers, on behalf

of individuals with private or public insurance, may employ a variety of healthcare

mechanisms to ensure delivery of and payment for dental services, such as in-

network and out-of-network provider plans, or preferred provider organizations.

Almost no evidence hints at what rates insurers of individuals with private or public

insurance will pay dentists.  Those rates may well be less than the rates Dr. Crall

---

[5] Ms. Sreckovich's rebutting testimony distinguishes this case from Memisovski, in which there was no admissible rebutting testimony.  2004 WL 1878332, at *43 & n.17.

used in his percentiles approach.

For instance, while discussing the insufficiency of DPW's reimbursement rates, Dr. Luccy briefly remarked that when he was paid by a private indemnity insurance plan, he was paid 100% of his UCR.  FOF ¶171.  When Dr. Luccy was paid by a preferred provider organization, he was paid 85% to 93% of his UCR.  Id.  Dr. Crall also tersely acknowledged that dentists do not always receive 100% of their UCR or charges.  See Tr. Mar. 21, 2005, at 104-05.

Plaintiffs presented no other evidence on reimbursement rates paid by insurers of individuals with private or public insurance.  FOF ¶173.  This deficiency is critical because what dentists charge in the Mid-Atlantic region, or what dentists charge within discrete geographic regions of Pennsylvania, may not necessarily be consistent with what they are actually being paid. FOF ¶¶170-72.  At least one court that found a violation of the equal access provision partly relied on testimony from a string of dentists testifying as to the gross disparity between a state's reimbursement rates and the private and public insurers' reimbursement rates.  See Memisovski, 2004 WL 1878332, at *43.  We do not have before us evidence similar to that which was before the Memisovski court.

Another matter of concern to the court is plaintiffs' interpretation of a letter from CMS.  Plaintiffs rely heavily on a letter from CMS in which CMS

recommends that states should set reimbursement rates no lower than the rates charged by 50% of dentists (or the 50th percentile).  FOF ¶151.  CMS also recommended in the letter that states should aspire to set reimbursement rates equal to the rates charged at the 75th percentile, a goal suggested by the ADA (an entity that obviously has an interest in higher reimbursement rates for its members).  Id. Plaintiffs contend that, per the CMS letter, MA reimbursement rates should be no lower than the rates usually charged by 50% of Pennsylvania dentists, that is, the 50th percentile.  But if the 50th percentile truly was a floor, CMS would have found Pennsylvania out of compliance, yet CMS has never found Pennsylvania out of compliance.  FOF ¶¶6, 45.

The court is also concerned with the lack of any helpful guideposts for setting rates.  Some courts, for example, have looked to Medicare reimbursement rates when deciding whether Medicaid reimbursement rates are inadequate. See Oklahoma Chapter of the American Academy of Pediatrics (OKAAP) v. Fogarty, 366 F. Supp. 2d 1050, 1106-07 (N.D. Okla. 2005) (finding Medicaid reimbursement rates that fall below Medicare reimbursement rates inadequate to attract a sufficient number of healthcare providers); Memisovski, 2004 WL 1878332, at *43 (same).  Medicare does not cover dental services so DPW's reimbursement rates cannot be measured against Medicare rates.  Thus, we do not

have the benefit of being able to use Medicare rates as a reference.  Nor has a

neutral proxy for Medicare rates been put before us to serve as a reference.

In addition, we cannot ignore the disappointing effect voluntary and court-

ordered rate increases have had in other states.  Most notably, after the Kizer court

found California in violation of the equal access provision, California voluntarily

increased reimbursement rates to 55% of average dental charges (essentially the 55th

percentile).  See Clark v. Coye, 967 F.2d 585, 1992 WL 149278, at *2 (9th Cir.

June 23, 1992) (Coye I) (unpublished opinion), aff'g in part and vacating in part,

Kizer, 758 F. Supp. 572.  On remand, the magistrate judge overseeing the

implementation of the rate increases found that the voluntary 55% rate increases

"resulted in no significant increase in providers, no significant increase in provider

participation, and no significant change in utilization rate."  Clark v. Coye, 8 F.3d

26, 1993 WL 394846, at *1 (9th Cir. Oct. 5, 1993) (Coye II) (unpublished opinion),

aff'g in relevant part, 1992 WL 370801 (E.D. Cal. Oct. 14, 1992).  The magistrate

judge therefore ordered increases of reimbursement rates to the 80th percentile.  See

id.  The Ninth Circuit affirmed the increases.  See id.  Despite these significant

increases to the 80th percentile, California still saw minimal increases in dental

provider enrollment and lackluster utilization of dental services by eligible

recipients.  FOF ¶185.  If the significant rate increases in California had such little

effect, the court is skeptical as to whether rate increases in this case would have any salutory effect.

In that vein, due consideration must be given to DPW's experience with increasing reimbursement rates.  When DPW raised its rates in response to the dental summits, literally doing everything dentists asked, DPW saw little increase in dentist enrollment in the MA program.  FOF ¶¶175-77, 187.  This experience jaundiced DPW towards future rate increases.  Yet, DPW remains committed to assuring equal access and, with the 2005/06 Budget, increased certain reimbursement rates for dental services.  FOF ¶¶99-100, 186.  These rates may still lag behind dentists' charges and rates paid by private insurers, but rates paid be states will almost always lag behind the rates paid at the moment in the free market because states methodically set their rates by retrospectively analyzing data from the last year or years, not prospectively.

One example of an increased reimbursement rate is the behavior management fee that went into effect July 1, 2005.  FOF ¶¶165-69.  Of course, the financial impact of the behavior management fee decreases with the number of services performed per visit, see FOF ¶169, but the increase in the behavior management fee nonetheless demonstrates DPW's commitment to assuring equal access through reimbursement rates "consistent with efficiency, economy, and quality."  42 U.S.C.

§ 1396a(a)(30)(A).

After balancing all of the above considerations, the court concludes that, while DPW's reimbursement rates are not very attractive to dentists, the rates are not egregiously low, as plaintiffs claim.  Ms. Sreckovich's analysis and Pennsylvania's past experience regarding rate increases, as well as the past experience of other states such as California, suggest that equality of access cannot be measured simply by comparing reimbursement rates to dentists' charges.  It would be unreasonable, therefore, to infer unequal access from the evidence presented regarding level of reimbursement.

## 2.  The Level of Dentist Participation

The level of dentist participation in the MA program generally reflects the number of dentists available to serve a given population, be that individuals eligible for MA dental services or the general population.  There are approximately 12.8 million individuals residing in Pennsylvania.  FOF ¶118.  Of those 12.8 million, approximately 895,534 individuals are under age 21 and eligible for MA dental services.   FOF ¶119.  Also, of those 12.8 million, approximately 472,485 individuals are age 21 and older who are eligible for MA dental services.  FOF ¶120.  Classmembers comprise only 15% of the total MA population, or 270,000 individuals.  FOF ¶ 7.

Approximately 8,031 dentists are licensed to practice in Pennsylvania.  FOF

¶121.  Approximately 5,764, or 72% of the 8,031 licensed dentists are enrolled in

the MA program.  FOF ¶123.  Just because a dentist is enrolled in the MA

program, however, does not mean that he or she actually treats any MA recipients.

Dentists, of course, whether enrolled or unenrolled in the MA program, can limit the

number and types of patients they treat.  FOF ¶124.  The evidence shows that a

lesser number of enrolled dentists actually participate in the MA program, that is,

actually treat an MA recipient.  FOF ¶¶124-26.  Even the number of participating

dentists is misleading because a participating dentist is defined as one who has

submitted at least one bill for services in the past year.  Theoretically, therefore,

enrolled dentists who only treat a small number of MA recipients are considered as

participating in the MA program.  FOF ¶126.

Of the 8,031 total dentists in Pennsylvania, only 1,254, or 15%, actually

participate in the MA program by treating MA recipients covered under the fee-for-

service system.  FOF ¶128.  DPW has not requested or received any data that

would show or establish the number of dentists participating in the MA program by

treating MA recipients covered under any of the MCOs.  FOF ¶¶127-28.  Available

data only show the number of dentists enrolled, (as opposed to the number of

dentists participating), in the MA program for the areas covered by MCOs.  See

Ex. P-32, at 6-8.  Even using the inflated number of enrolled dentists in the MCO

zones, only about 14% to 21% of the total number of licensed dentists per MCO

zone are actually enrolled in the MA program.[6]  See id.  In short, a low number of

dentists actually service MA recipients in general, and classmembers in particular.

DPW counters that Dr. Crall did not take into account the number of

classmembers receiving dental services through other sources such as dental

clinics.  See FOF ¶¶131-32.  DPW also contends that there is a higher ratio of MA

enrolled dentists to classmembers than there are total dentists to the general

population.  Ms. Sreckovich suggests that, based on data used by Dr. Crall and

data obtained from the U.S. Census Bureau, more dentists are available to service

classmembers than there are dentists available to service the general population.

FOF ¶159; see Exs. D-43, D-55 at 31.  Ms. Sreckovich's suggestion is

mathematically correct.  The ratio of enrolled dentists to eligible MA recipients is

higher than the ratio of dentists to the general population.  See Exs. D-43, D-55, at

30-31.

Of course, a major qualification attached to that conclusion is that the

---

[6] For example, there are a total of 1,444 dentists in the Lehigh/Capital Zone, and a total of 209 dentists enrolled in that zone, which means about 14% of dentists in the Lehigh/Capital zone are enrolled (209 / 1,444 . .14, or 14%).

number of enrolled dentists does not accurately reflect the number of participating dentists, and the number of participating dentists does not accurately reflect the number of dentists *actively* participating in the MA program, such as by treating MA recipients on a more than infrequent basis.  <u>See</u> Exs. D-43, D-55 at 31.  To be fair, though, we have no evidence before us indicating how many dentists actively serve the general population versus limiting the number of patients they treat.  In addition, the certified class only includes eligible MA recipients with disabilities or special needs, totaling about 270,000 individuals.  For plaintiffs' benefit, we use the larger number of MA recipients eligible for dental services in our calculations.  Thus, the numbers at the court's disposal are overstated in multiple respects that benefit both parties.  With that being said, the court determines that the ratio of dentists servicing the eligible MA population is not so stark when juxtaposed with the ratio of dentists servicing the general population.  <u>See</u> Ex. D-43, Ex. 55, at 30-31.

After balancing all of the above considerations, the court concludes that the level of dentist participation in the MA program is low.  Still, we cannot conclude from the evidence before us that the number of dentists available to service actively eligible MA recipients substantially differs from the number of dentists available to service actively the general population.

-72-

It would be unreasonable, therefore, to infer unequal access from the evidence presented regarding level of dentist participation.

## 3.  Reports of Difficulty Obtaining Services

A "steady stream" of reports that MA recipients were having difficulty obtaining dental services suggests that equal access to dental services does not exist.  See Kizer, 758 F. Supp. at 578.  In the instant case, four representative plaintiffs' parents and/or guardians generally testified that they had difficulty in obtaining dental services.  See FOF ¶¶102-118.  When pressed, however, three of the four witnesses indicated that they eventually located a dental provider, or received some support.  See FOF ¶¶105, 108, 117.  Ms. Clark did not initially know of the special needs unit.  FOF ¶104.  Once a clinic opened closer to Ms. Conrad's home, she scheduled appointments there for K.S.  FOF ¶108.  She discontinued taking K.S. to the clinic because her husband obtained private dental insurance that covered K.S.  Id.  Ms. Coccia initially had success with taking her daughter to yet another clinic but became unhappy with the clinic staff's treatment of her daughter.  FOF ¶117.

While all four witnesses' personal accounts were candid and lamentable, the accounts are nonetheless anecdotal and not necessarily demonstrative of the level of access of MA recipients to dental services.  Cf. Lewis v. Casey, 518 U.S. 343,

359-60 (1996) (systemwide injunctive relief must rest on a showing of a systemwide violation).  Surely, all four witnesses had some difficulty in locating dentists, but they did not exhaust all available avenues.  Ms. Conrad did not try to locate an enrolled dentist after a certain point.  Ms. Conrad resigned to taking K.S. to her family doctor until a clinic opened nearby.  FOF ¶¶107-08.  Ms. Coccia contacted a couple of dentists and then concluded that there "weren't any options other than going to one of the speciality centers that the Department of Welfare set up."  FOF ¶114.  MA recipients should not have to expend substantial energy in locating an MA enrolled dentist willing to provide treatment, but they can be expected to make a reasonable effort to exhaust channels open to assist them in locating dental services.

Moreover, the witnesses' difficulty in trying to obtain dental services largely arose in the late 1990's and early 2000's, before or at about the time DPW's MCO contracts were going into effect.  See FOF ¶¶21-22. Since then, three of the four witnesses report little or no difficulty (for whatever reason) scheduling dental services.  In addition, since then DPW has overseen the implementation of a number of mechanisms designed to improve access.  See FOF ¶¶46-57, 70-74.

Finally, the testimony of the personal accounts of only four witnesses, no matter how persuasive, cannot be deemed statistically significant.

Plaintiffs point to other evidence of difficulty in obtaining services, such as letters from County Assistance Offices (CAOs) submitted to the Department of Health as part of applications for community challenge grants, statements of AHS employees as to the difficulty in providing dental care to MA recipients, and Dr. Westerburg's testimony.  See, e.g., FOF ¶¶68, 93.  The court will not view the letters from the CAOs out of context.  The letters were all written to obtain additional funds to assist with the continual need to link MA recipients with participating dentists.  Funding will always be required to meet this ongoing need.  The CAO letters may express difficulties in arranging for dental services for MA recipients, but the letters also plainly represent efforts to rectify such difficulties.

The testimony of AHS employees must also be viewed in context.  AHS admits to having difficulty in matching MA recipients with participating dentists, but AHS also reports a high success rate in doing so.  Dr. Westerberg did not directly state that MA recipients are experiencing difficulty in obtaining services, but merely read some of the CAO letters and reasoned that they were probably written to garner more money to help assure that MA recipients receive dental services.  See Tr. Mar. 22, 2005, at 90-95, 100-01.

Finally, no evidence compares the level of difficulty MA recipients experience in seeking dental services to the level of difficulty members of the

general population experience in seeking dental services.  This point is significant

with respect to the more rural counties of the Commonwealth.  A majority, if not

all, of the CAO letters came from rural counties which already have a low number

of dentists.  See Exs. P-12 through P-17, P-38 through P-40, P-43 through P-45.

For instance, one CAO letter is from Forest County.  See Ex. P-38.  About 5,000

people reside in Forest County.  See Ex. P-6.  Only one active dentist resides in

Forest County.  See Ex. P-7, at 2.  Four dentists are enrolled in the MA program's

fee-for-service system that covers Forest County, while only one actually

participates in it.[7]  See Ex. P-8.  Given the low number of dentists residing in

counties like Forest,[8] the general population of the county likely experiences the

same, if not greater, degree of difficulty in obtaining dental services than the MA

population in the county, at least in terms of locating a dentist close to one's home.

Cf. Bruggeman ex rel. Bruggeman v. Blagojevich, 324 F.3d 906, 910-911 (7th Cir.

2003) (Posner, J.) (Title XIX does not entitle MA recipients to minimum driving

radius for services).

---

[7] Dentists may enroll in the MA program to service multiple counties, see,
e.g., P-32 at 8 n.11, which explains why there are four times the number of enrolled
dentists than dentists residing in Forest County.

[8] As we noted above, the county is the pertinent geographic area for
purposes of an equal access challenge involving the fee-for-service system.

Dental services are not seamlessly available to eligible MA recipients. Nevertheless, DPW employs many mechanisms to link eligible MA recipients with dental providers and to remedy any difficulties encountered.  Additionally, little can be gleaned from the evidence regarding the level of difficulty the general population typically encounters in the pertinent geographic areas.

It would be unreasonable to infer unequal access for MA recipients generally from the evidence regarding difficulty in obtaining dental services.

## 4.  The Level of Utilization of Dental Services

This factor rests on the premise that if a low number of MA recipients are utilizing dental services, one can infer that they do not enjoy equal access to dental services.  Plaintiffs argue that the 50% utilization rate recommended by CMS is the target goal.  FOF ¶151.

Plaintiffs' data reveal that, at best, about 37% of eligible MA recipient received any dental services in 2001.  See Ex. P-29, at 6; see also FOF ¶¶134-40. On average, the number of eligible MA recipients who received any dental services in 2001 is in the range of 20% to 28%.  FOF ¶¶135-140.  This falls below the floor suggested for the general population of 50% utilization.

Yet, as DPW notes, many factors contribute to low utilization, such as fear

of dentists, no education on the importance of dental care, lack of transportation, etc.  FOF ¶141.  Further, DPW has established numerous outreach programs and improved access, and has mailings, handbooks, magnets, internet sites, and call centers.  FOF ¶¶35-36, 62.  AHS reports a success rate of 98% when fielding telephone inquiries related to dental services.  FOF ¶65.

Moreover, DPW argues that the encounter data for whether eligible MA recipients utilized dental services was incomplete or incorrect when the MCOs first got started about the time the exhibits relied on by plaintiffs were put together.  FOF ¶¶143-45.  Also, the data do not reflect whether MA recipients are receiving dental services through other sources such as public or non-profit clinics, or through private insurance such as K.S. is currently receiving.  FOF ¶¶108, 131-32.  Furthermore, eligibility for Medicaid changes, and persons may go on and off the MA program.  Tr. Mar. 23, 2005, at 65-67.

In addition, little if any evidence speaks to the utilization of dental services by individuals with private or public insurance.  The closest evidence regarding utilization by the general population came from Dr. Crall, who testified that he would expect utilization in the private sector "to be in the range of fifty to seventy percent."  Tr. Mar. 21, 2005, at 71.  Without more specific data on the level of utilization by individuals with private or public insurance, the court cannot

-78-

accurately gauge the significance of the level of utilization of dental services by eligible MA recipients.  The court earlier alluded to the perceived difficulty in obtaining data to allow for a proper comparison in conjunction with an equal access challenge.  See Clark, 339 F. Supp. 2d at 645.

In short, the court is not convinced that the utilization rates plaintiffs presented at trial accurately reflect the level of utilization of dental services by eligible MA recipients.  A reasonable inference regarding equality of access cannot be based on an average utilization rate in the range of 20% to 28% without a commensurate, substantiated average utilization rate for individuals with private and public insurance.

## 5.  Whether DPW Admits Rates are Inadequate

Plaintiffs trumpet numerous statements of DPW officials, consultants, and county officials lamenting over the challenges associated with assuring that MA recipients enjoy equal access to dental services.  See FOF ¶¶68, 93.  Indeed, all of these statements underscore the vexatious, ongoing task of assuring that MA recipients receive adequate dental services in the face of ever-increasing costs and declining federal funding.  The court does not take any of the statements to be a wholesale admission that DPW's reimbursements are inadequate.  The statements certainly differ from unequivocating statements other courts have cited as evidence

-79-

that state officials admit that reimbursement rates are inadequate.  See OKAAP, 366

F. Supp. 2d at 1075, 1107; Memisovski, 2004 WL 1878332, at *20.

DPW raised reimbursement rates in 1999 and 2001.  FOF ¶81.  These

increases accompanied a variety of changes recommended by dentists, all of which

were designed to streamline the enrollment process for dentists and attract more

dentists to enroll and participation in the MA program.  See, e.g., FOF ¶¶77-80.

DPW saw only a negligible increase in dentist participation following the

implementation of these recommendations.  FOF ¶90.

Based on this experience, DPW concluded that increasing reimbursement

rates did not guarantee more dentist participation and increased utilization of dental

services.  FOF ¶¶91, 175-77, 187-89.  Pennsylvania's experience mirrored that of

other states that increased rates and saw little increased utilization, even when the

rate increases were coupled with a cut in the number of dental services provided.

FOF ¶¶98, 179-89.

The court believes that DPW remains committed to assuring equal access to

dental services for eligible MA recipients.  FOF ¶94.  DPW continues to innovate

mechanisms and processes aimed at increasing utilization and attracting more

dentists.  See, e.g., FOF ¶¶70-74, 100-01.  Targeted rate increases such as those

recently put into effect do not connote DPW's tacit admission that its past rates

were inadequate, but merely reflect the realities of Pennsylvania's continuous efforts to increase utilization and dentist participation.  FOF ¶¶100-01.  No state has found the perfect formula and that formula or something close to it will only be found through further state experimentation and modification of existing plans.

DPW officials remain committed to providing dental services to classmembers.  Their statements do not reflect a blanket admission of failure but a recognition of a persistent challenge requiring assiduous attention.

It would be unreasonable to infer unequal access from the evidence regarding statements of DPW officials.

## 6.  Final Balancing of the Factors

To summarize, the court finds Pennsylvania's reimbursement rates are low insofar as they might not attract many dentists.  In fact, not many dentists actively participate in the MA program.  Simultaneously, though, the court cannot determine from the evidence presented whether the ratio of dentists to eligible MA recipients is out-of-line with the ratio of dentists to individuals with private and public insurance dwelling in the pertinent geographic areas.  Also, increasing reimbursement rates will not necessarily increase utilization.

Regarding utilization, evidentiary shortcomings prevent the court from comparing the utilization of dental services by eligible MA recipients to the

utilization of dental services by individuals with private and public insurance

dwelling in the pertinent geographic areas.  Scattered reports of difficulty obtaining

dental services by eligible MA recipients in the pertinent geographic areas do not

amount to the stream of steady reports that is usually indicative of inequality of

access.  Further, individuals with private and public insurance in those same areas

may also have difficulty in obtaining dental services.  Lastly, DPW does not admit

that its reimbursement rates and dental services initiative are inadequate but rather

recognizes the obstacles it faces in assuring equal access and fastidiously toils to

assure equality of access.

The court cannot reasonably infer from the evidence regarding the five

factors, whether considered individually or collectively, that classmembers do not

enjoy equal access to dental services.

Accordingly, the court concludes that plaintiffs have not carried their burden

of proving a violation of the equal access provision by a preponderance of the

evidence.

## B.  Plaintiffs' EPSDT Challenge

DPW must comply with the EPSDT provisions.  <u>See</u> 42 U.S.C.

§§ 1396a(a)(43); 1396d(a)(4)(B); 1396d(r); 42 C.F.R. §§ 441.50, 441.56.  Under 42

U.S.C. § 1396a(a)(43), the Commonwealth's plan must provide for informing all

eligible individuals under 21 years of age of the availability of EPSDT services.  42

U.S.C. § 1396a(a)(43)(A).  Additionally, the Commonwealth's "plan for medical

assistance must . . .provide for . . . providing[,] or arranging for the provision of[,]

such screening services *in all cases where they are requested*."  42 U.S.C.

§§ 1396a(a), (a)(43)(B) (emphasis added); see Frew ex rel. Frew v. Hawkins, 540

U.S. 431, 433-34 (2004).  Certain dental services fall under the umbrella of EPSDT

services.  See 42 U.S.C. § 1396d(r)(1)&(3).  In addition, the Commonwealth "must

set standards for the timely provision of EPSDT services which meet reasonable

standards of medical and dental practice" after consultation with professional

organizations and "must employ processes to ensure timely initiation of treatment,

if required, generally within an outer limit of 6 months after the request for screening

services."  42 C.F.R. § 441.56(e). See Memisovski, 2004 WL 1878332, at *50.

Plaintiffs argue that the Commonwealth is failing to employ processes to

assure the timely provision of EPSDT services.  Specifically, plaintiffs claim that

DPW has no standards for timeliness beyond that time period for initial treatment

mandated under 42 C.F.R. § 441.56(e), and that the Commonwealth does not

monitor the initiation or provision of treatment.  Plaintiffs also claim that the

Commonwealth has failed to consult with appropriate dental organizations in order

to establish timeliness standards for the timely provision of initial dental treatment,

an EPSDT service.  See 42 U.S.C. § 1396d(r)(3).

We discount plaintiffs' latter argument first.  DPW created a periodicity schedule after consultation with the Pediatric Dental Association and the Academy of Pediatric Physicians.  FOF ¶198.  This satisfies the consultation requirement of 42 C.F.R. § 441.56(e).

To the extent plaintiffs may also challenge DPW's mechanisms for informing MA children of dental services, see 42 U.S.C. § 1396a(a)(43)(A), we find that challenge lacks merit.  DPW requires all MCOs to comply with the EPSDT services provisions.  FOF ¶199.  A number of other outreach mechanisms exist, such as mailing MA recipients informative letters, brochures, and handbooks, making telephone calls to and fielding telephone calls from MA recipients, and maintaining websites with wealths of information.  FOF ¶¶27-29, 37, 62, 69, 72, 80, 84.  Plaintiffs presented no evidence showing that any MCOs breached the terms of the HealthChoices Standard Agreement, or that DPW's other various outreach initiatives are categorically deficient.  See Memisovski 2004 WL 1878332, at *48 (finding manner of notifying MA recipients of services deficient).

Plaintiffs' remaining argument is that DPW cannot effectively provide or arrange for the provision of EPSDT dental services because DPW has not established timeliness standards for initial and follow-up treatment, such as, for

example, a maximum time that an eligible MA recipient must wait before actually

seeing a dentist and receiving EPSDT services.  In support of this argument,

plaintiffs cite: (1) AHS's pronounced difficulty with finding dental care for MA

children, see Ex. P-17, at 1; (2) CAO officials' letters in which they write that they

have been unable to match MA children with dentists, see Exs. P-14 through P-16,

P-38 through P-40; (3) references in the MCO monitoring reports that MA children

have had difficulty accessing dental care, see, e.g., Ex. P-29, at 3, 28-29; and (4)

evidence that medical bills have not been submitted for a number of MA children,

see Ex. P-20, Tab C.

　　　We already discussed how statements from AHS and CAO officials are not

admissions of inadequacy, see supra Part II.A.5.  The references to children having

difficulty accessing dental services in the MCO reports are at best abstract

observations of areas needing continued attention and improvement.  See Westside

Mothers v. Olszewski, 368 F. Supp. 2d 740, 768-69 (E.D. Mich. 2005) (perfect

compliance with EPSDT provisions, namely, that 100% of eligible MA children

receive EPSDT services, is not required).  We do not view the generalized,

unsupported statements in the MCO reports as concrete evidence that MA children

who request dental services are not being provided with those services.  Likewise,

we do not extrapolate from the number of MA children for whom medical bills

have not been submitted that those children are not being provided with EPSDT services upon requesting such services.

Crucially, scant evidence exists that EPSDT services are not being provided "where they are requested." 42 U.S.C. § 1396a(a)(43)(B). The testimony of Ms. Coccia and Ms. Figueroa concerning their apparent difficulties in obtaining dental services for their daughters is the only direct evidence that EPSDT services are not being provided when requested. FOF ¶¶110-117. That testimony, though, only tangentially relates to the issue of EPSDT services. Moreover, only Ms. Figueroa continues to have difficulty scheduling dental visits for her child. FOF ¶113. Finally, plaintiffs cite no authority, and the court is aware of none, that mandates thorough timeliness standards instead of the periodicity schedule DPW adopted pursuant to existing regulations.

Taking all of this into consideration, the court concludes that plaintiffs have not shown by a preponderance of the evidence that DPW is in violation of the pertinent EPSDT provisions.


## CONCLUSION:

Plaintiffs have not carried their burden with respect to whether DPW is in violation of the equal access provision or the EPSDT provisions. Consequently,

the court will enter an order in favor of DPW on plaintiffs' remaining claims.  An

appropriate order follows.


                                                   s/ James F. McClure, Jr.
                                                  James F. McClure, Jr.
                                                United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PATRICIA CLARK, et al.,            :
                Plaintiffs,        :
                                   :        No. 4:00-CV-1306
        v.                         :
                                   :        (Judge McClure)
ESTELLE B. RICHMAN, in her         :
official capacity as Secretary of  :
Public Welfare of the             :
Commonwealth of Pennsylvania,      :
                Defendant.         :

# **O R D E R**

August 17, 2005

For the reasons set forth in the accompanying memorandum,

**IT IS ORDERED THAT:**

1.      Final judgment is entered in favor of defendant and against plaintiffs

on all claims.

2.      The clerk is directed to close the case file.

                                        s/ James F. McClure, Jr.
                                        James F. McClure, Jr.
                                        United States District Judge

Order Page 1 of 1